825 P.2d 482

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Robert L. BROWN, Defendant–Appellant.**

No. 18442.

Supreme Court of Idaho,
Lewiston, September 1991 Term.

Jan. 10, 1992.

Fitzgerald & Sims, Lewiston, for defendant-appellant. William J. Fitzgerald, argued.

Larry J. EchoHawk, Atty. Gen., Lynn E. Thomas, Sol. Gen., Boise, for plaintiff-respondent. Lynn E. Thomas, argued.

JOHNSON, Justice.

This is a criminal case. In affirming convictions and sentences for rape, robbery, and aggravated battery we hold that the trial court did not abuse its discretion by (1) refusing to allow the withdrawal of the defendant's guilty pleas, (2) considering the defendant's juvenile records at the sentencing hearing, (3) admitting into evidence at the sentencing hearing the defendant's death threat list and letters by the defendant describing other violent crimes, (4) not disqualifying himself upon learning of a death threat against him by the defendant, and (5) not granting the defendant's request to be examined by an expert of the defendant's choice concerning the defendant's mental capacity. We also hold that the trial court did not act unreasonably or impose cruel and unusual punishment by sentencing the defendant to a fixed life sentence.

## I.

### THE BACKGROUND AND PRIOR PROCEEDINGS.

On March 21, 1989, someone entered a business in Lewiston, Idaho, forced a female employee into a back room, beat her on the head with a brick, raped her, stabbed her twice in the chest with a knife, and cut her throat. The assailant also robbed the victim of her jewelry and credit cards. The victim survived after receiving emergency heart surgery.

The victim identified Robert L. Brown as her assailant. A number of people had witnessed Brown going to and from the business where the victim worked. Pursuant to a search warrant, officers searched Brown and found credit cards and other items belonging to the victim. Other evidence also linked Brown to the incident.

On March 22, 1989, officers arrested Brown. The prosecutor filed a complaint charging Brown with (1) rape, (2) robbery, (3) aggravated battery, (4) battery with intent to commit a serious felony, (5) attempted murder in the first degree, (6) grand theft, and (7) burglary in the second

degree. The prosecutor also sought an enhanced sentence against Brown for inflicting great bodily harm on the victim. Following a preliminary hearing, the magistrate judge bound Brown over for trial on these charges.

On June 22, 1989, Brown filed a written application with the trial court stating his intent to plead guilty to the charges of rape, robbery, and aggravated battery pursuant to a plea bargain by which the state would dismiss the other charges and would strike the notice of intent to seek an enhanced sentence against Brown. Brown's attorney prepared this application, and Brown signed it. In the application Brown stated in detail that he understood the maximum penalties that could be imposed by the trial court, that he was pleading guilty voluntarily, and that he waived the rights he would have if he pled not guilty.

Before accepting Brown's guilty pleas, the trial court extensively questioned Brown to determine whether his pleas were voluntary and whether Brown understood the consequences of the pleas. The trial court specifically asked Brown if he understood that he could withdraw his pleas before the trial court accepted them and proceed to trial. The trial court also explained that if it accepted the pleas, the trial court would not allow Brown to withdraw his guilty pleas unless Brown could show the trial court a reason based in law to do so. Brown stated that he understood the implications of pleading guilty. After further interrogation of Brown and a recitation by the prosecutor of the evidence the state would offer to prove the charges, the trial court accepted the guilty pleas, ordered a presentence report, and scheduled Brown's sentencing for August 11, 1989.

During the presentence investigation, Brown refused requests of the presentence investigator to sign a release allowing the presentence investigator to obtain Brown's juvenile records from the Department of Health and Welfare (the Department). On July 25, 1989, the prosecutor filed a motion requesting that the trial court order the Department to release Brown's juvenile records.

On August 2, 1989, the presentence investigator completed the presentence investigation report, except the portion summarizing Brown's juvenile record. On August 8, 1989, Brown moved to withdraw his guilty pleas claiming that his attorney had said that Brown could withdraw his guilty pleas at any time and proceed to trial, if he desired to do so. Brown said that he had not yet read the presentence investigation report. The trial court denied Brown's motion to withdraw his pleas.

In September, 1989, Brown sought and obtained a psychological evaluation at the county's expense on the ground that there was reason to believe that Brown's mental condition would be a significant factor at sentencing. In early November 1989, Brown sought and obtained a psychiatric examination at county expense claiming that there was reason to doubt whether Brown lacked capacity to understand the proceedings against him or to assist in his own defense as a result of a mental disease or defect. The trial court also ordered the Department to release Brown's juvenile records to the presentence investigator. The presentence investigator then submitted an addendum to the presentence report incorporating information from Brown's juvenile record.

The court-appointed psychologist diagnosed Brown as having an anti-social personality, together with psycho-active substance abuse and an adjustment disorder with mixed disturbance of emotion and conduct. The psychiatrist concluded that Brown (1) was not mentally ill, (2) was capable of assisting in his defense, and (3) understood the proceedings against him. At the sentencing hearing, Brown requested a new examination by an expert of his own choosing concerning the psychiatrist's conclusions. The trial court denied this request.

At the sentencing hearing, the trial court considered the presentence investigation report, the addendum to the report, Brown's juvenile records, and Brown's court-appointed psychological and psychiatric evaluations. In addition, the trial court admitted in evidence a "death list" in which

Brown threatened to kill various people, and letters written by Brown to a fellow inmate describing homicides and other acts of violence he had perpetrated.

Brown moved to have the trial judge disqualified claiming that the trial judge was biased against Brown after reading the "death list." The trial judge denied the motion and stated that Brown's threat against the judge had no effect on the judge's impartiality.

At the conclusion of the sentencing hearing, the trial court stated that it had reviewed the objectives of sentencing and the criteria that guide a trial court in determining appropriate sentences. The trial court sentenced Brown to a fixed life term for the rape, fifteen years to life for the robbery, and a fixed term of fifteen years for the aggravated battery charge. The trial court ordered these sentences to run concurrently. Brown appealed.

## II.

## THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN REFUSING TO ALLOW THE WITHDRAWAL OF THE GUILTY PLEAS.

■ Brown asserts that the trial court abused its discretion in refusing to allow the withdrawal of his guilty pleas. We disagree.

In *State v. Carrasco,* 117 Idaho 295, 787 P.2d 281 (1990), we reaffirmed that the standard of review on appeal in cases where a defendant has attempted to withdraw a guilty plea is whether the trial court abused its discretion in denying the motion. In *Carrasco,* the Court held that we look to the whole record to determine whether it is manifestly unjust to preclude the defendant from withdrawing a guilty plea. *Id.* at 298, 787 P.2d at 284.

In support of his motion to withdraw the pleas, Brown submitted his affidavit in which he stated the basis for his motion:

That through the discussion with his attorney he misunderstood that by pleading guilty he would be forever waiving his right to proceed to a trial; that he had understood his attorney to say that

if he desired to subsequently withdraw his pleas of guilty and proceed to trial that he would be able to.

This basis is undermined by Brown's own answer to the trial court's interrogation at the time the pleas were offered:

THE COURT: Before I accept your pleas of guilty, I'm going to ask some questions of the prosecutor, your defense attorney and of you. If I am satisfied at the end of those questions that this proceeding should move forward I'll again ask you how you plead.

THE DEFENDANT: Okay.

THE COURT: Up until that time if you want your guilty plea back to any of these charges or to all of these charges I will give you back your guilty plea, it will not be used against you and this case will go to trial.

If you again plead guilty in these proceedings and I accept your guilty plea and order it be entered on the record, I'll only give you back your guilty plea if you can show me a reason to do so, a reason based in law to do so. Do you understand what I have just said?

THE DEFENDANT: Yes, sir.

In a letter attached to his affidavit in support of the motion to allow him to withdraw his guilty pleas, Brown stated that he was innocent of the crimes charged. He stated that the evidence against him all seemed circumstantial. He said: "I pleaded guilty cause I wanted to get it over with as soon as possible, but I now realize that I am throwing my life away for something I didn't do, and I feel I can prove it in court to a jury." Brown did not mention any challenges to the evidence enumerated by the prosecutor at the hearing when Brown's pleas were accepted by the trial court, or any evidence that Brown would offer in his defense.

Brown had the burden of proving a reason for the trial court to allow him to withdraw his pleas. *State v. Ballard,* 114 Idaho 799, 801, 761 P.2d 1151, 1153 (1988). Whether Brown's general statements in his letter that he was innocent were sufficient

to carry this burden was a decision for the trial court to make in its discretion.

In denying Brown's motion, the trial court reviewed Brown's written application to enter the guilty pleas, the transcript of the hearing at which the trial court accepted the pleas, and Brown's affidavit and letter. The trial court found that Brown was thoroughly advised of his rights and the consequences of his pleas, that he understood the consequences of the pleas, and that there was a factual basis for the pleas. The trial court concluded that Brown entered the pleas freely, voluntarily, and intelligently. The trial court found that Brown had not shown a just reason to withdraw his pleas.

The trial court rightly perceived the issue as one of discretion, acted within the outer boundaries of this discretion and consistently with the legal standards applicable to granting or denying the motion, and reached its decision by an exercise of reason. *State v. Hedger*, 115 Idaho 598, 600, 768 P.2d 1331, 1333 (1989). Looking to the whole record, we cannot say it was manifestly unjust to deny Brown's request to withdraw his pleas.

### III.

### THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN CONSIDERING THE JUVENILE RECORDS.

 Brown asserts that the trial court should not have considered his juvenile records in sentencing him. We conclude that it was not an abuse of the trial court's discretion to consider these records.

Brown premises his objection to the consideration of these records on I.C. §§ 16–1816, 54–2314, and 54–3213 and I.R.E. 503(b)(2).

I.C. § 16–1816 is a portion of our Youth Rehabilitation Act. At the time of the trial court's consideration of Brown's juvenile records, this statute provided:

> **16–1816. Records—Privileged information.**—The court shall maintain records of all cases brought before it. In proceedings under this act the following records shall not be withheld from public inspection, except on court order, which order must be made in writing in each case: the court docket, petitions, complaints, information, motions and other papers filed in any case; transcripts of testimony taken by the court; and findings, verdicts, judgments, orders, decrees and other papers filed in proceedings before the court. These records shall be open to inspection by the parties and their attorneys, by an institution or agency to which custody of a child has been transferred, by an individual who has been appointed guardian with consent of the court, by persons having a legitimate interest in the proceedings; and, pursuant to rule or special order of the court, by persons conducting pertinent research studies, and by persons, institutions, and agencies having a legitimate interest in the protection, welfare or treatment of the child. Reports of social and clinical studies or examinations made pursuant to this act shall be withheld from public inspection, except that facts contained in such reports shall be furnished upon request in a manner determined by the court to persons and governmental and private agencies and institutions conducting pertinent research studies or having a legitimate interest in the protection, welfare and treatment of the child. All information obtained and social records prepared in the discharge of official duty by an employee of the court shall not be disclosed directly or indirectly to anyone other than the court or others entitled under this act to receive such information, unless and until otherwise ordered by the court.

> The victim of misconduct shall always be entitled to the name of the child involved, the name of the child's parents or guardian, and their addresses and telephone numbers, if available in the records of the court.

I.C. § 16–1816 (Supp.1989).

This statute concerns restricting "public inspection" of juvenile records. Most of these records are, however, open to inspection by "persons having a legitimate interest in the proceedings." The Court may

release reports of social and clinical studies or examinations to governmental agencies having a legitimate interest in the protection, welfare, and treatment of the child. We do not read the statute to preclude this access to the records and reports when the child becomes an adult.

■ I.C. § 54–2314 provides:

**54–2314. Privileged communication—Confidential relations and communications between psychologist and client.**—A person licensed as a psychologist under the provisions of this act cannot, without the written consent of his client, be examined in a civil or criminal action as to any information acquired in the course of his professional services in behalf of the client. The confidential relations and communications between a psychologist and his client are on the same basis as those provided by law between an attorney and client, and nothing in this article shall be construed to require any such privileged communication to be disclosed.

This statute does not apply to psychological reports to a court in the course of juvenile proceedings. These reports become part of the court records and are no longer correctly characterized as "information acquired in the course of [the psychologist's] professional services in behalf of the client." I.C. § 54–2314.

■ I.C. § 54–3213, which is part of the Social Work Licensing Act, provides:

**54–3213. Privileged communications.**—No person licensed under the provisions of this act shall disclose any information he may have acquired from persons consulting him in his professional capacity that was necessary to enable him to render services in his professional capacity to those persons, except:

(1) With the written consent of that person or, in the case of death or disability, of his own personal representative, other person authorized to sue, or the beneficiary of an insurance policy on his life, health or physical condition;

(2) That a person licensed under the provisions of this act shall not be required to treat as confidential communi-

cation that reveals the contemplation or execution of a crime or harmful act;

(3) When the person is a minor under the laws of this state, and the information acquired by the licensee indicates that the minor was the victim or subject of a crime, the licensee may testify fully in relation thereto upon any examination, trial, or other proceeding in which the commission of such a crime is the subject of the inquiry;

(4) When the person waives the privilege by bringing charges against the licensee.

Similar to the application of I.C. § 54–2314, this statute does not apply to reports by social workers to a court in the course of juvenile proceedings. These reports become part of the court records and are no longer correctly characterized as "information [the social worker] may have acquired from persons consulting [the social worker] in [the social worker's] professional capacity that was necessary to enable [the social worker] to render services in [the social worker's] professional capacity to those persons." I.C. § 54–3213.

■ I.R.E. 503(b)(2) provides:

A patient [of a physician or psychotherapist] has a privilege in a criminal action to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of diagnosis or treatment of [the patient's] physical, mental or emotional condition, including alcohol or drug addiction, among [the patient], [the patient's] physician or psychotherapist, and persons who are participating in the diagnosis or treatment under the direction of the psychotherapist, including members of the patient's family.

Similarly, this rule does not apply to communications by a psychotherapist that have become part of the court records in a juvenile proceeding. The privilege or confidentiality of these records is governed by the provisions of I.C. § 16–1816.

■ It was within the discretion of the trial court to order the Department to re-

lease Brown's juvenile records to the presentence investigator. As this Court recognized many years ago:

> Where discretion is conferred upon the court in fixing the punishment for crime the law recognizes that the previous character, good or bad, of one convicted should be considered in fixing the punishment....

*State v. Weise*, 75 Idaho 404, 411, 273 P.2d 97, 101 (1954).

The Court has also recognized that the trial court

> has much more latitude regarding information which it may consider for purposes of sentencing once a criminal defendant's guilt has been established than the court or the jury could have considered at the phase of a trial in which the state is attempting to establish a defendant's guilt.

*State v. Ballard*, 93 Idaho 355, 359, 461 P.2d 250, 254 (1969).

The trial court "has broad discretion in determining what evidence is to be admitted at a sentencing hearing" (*State v. Johnson*, 101 Idaho 581, 583, 618 P.2d 759, 761 (1980)) and "is entitled to consider a wide range of relevant evidence when [the trial court] evaluates what the appropriate sentence for each particular defendant [the trial court] sentences may be." *Sivak v. State*, 112 Idaho 197, 214, 731 P.2d 192, 209 (1987).

In *State v. Romero*, 116 Idaho 391, 775 P.2d 1233 (1989), the Court said:

> After a jury's determination of guilt, it is *essential* that the court receive all available adequate information about the defendant, before imposing a sentence which hopefully will be commensurate with the crime for which the defendant has been convicted.

*Id.* at 393, 775 P.2d at 1235 (emphasis in original).

In granting the state's motion for release of Brown's juvenile records, the trial court stated:

> It's the position of the court that the juvenile record of a person who has committed a crime, has pled guilty and where a presentence investigation report is or-

dered that that information is accessible to the presentence investigator by an order of the court and that the court should have that information in order to make a determination of what an appropriate sentence would be.

> Taking into consideration the nature of the offenses committed and the fact that ... it may or may not be of importance, depending upon what the record shows, but it may show types of treatment, types of programs that the defendant has gone through before, may or may not show previous offenses of the nature of the offenses that were committed in this particular situation and certainly I think that it's relevant and material and it should be considered by the court ... if in fact there is information there.

> ... I want to know all I can about the defendant that is relevant and material with regard to prior treatment, with regard to prior crimes, with regard to prior history prior to the time that the defendant is sentenced.

Applying the analysis of *State v. Hedger*, we conclude that the trial court did not abuse its discretion in considering Brown's juvenile record.

## IV.

THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN ADMITTING THE DEATH THREAT LIST AND LETTERS DETAILING OTHER VIOLENT CRIMES.

■ Brown asserts that the trial court should not have admitted into evidence at the sentencing hearing Brown's death threat list and Brown's letters detailing other violent crimes he had committed. We hold that the trial court did not abuse its discretion in admitting these items.

Brown argues that these items were not relevant to the issues at sentencing and that their probative value was substantially outweighed by the danger of unfair prejudice. As we have noted above in discussing the consideration of Brown's juvenile record, the trial court has broad discretion

in deciding what should be admitted at a sentencing hearing.

The death threat list and the letters related to Brown's dangerousness to society and to his character. Applying the analysis of *State v. Hedger*, we conclude that the trial court did not abuse its discretion in admitting these items.

### V.

### THE TRIAL JUDGE DID NOT ABUSE HIS DISCRETION BY NOT DISQUALIFYING HIMSELF UPON LEARNING OF A DEATH THREAT BY BROWN AGAINST HIM.

■ Brown asserts that the trial judge should have disqualified himself upon learning of Brown's death threat against him. We conclude that the trial judge did not abuse his discretion in not disqualifying himself.

After the trial court admitted the death threat list at the sentencing hearing, Brown's attorney moved pursuant to I.C.R. 25 to have the trial judge disqualify himself on the grounds that the judge was biased or prejudiced against Brown. In denying the motion, the judge stated the death list's personal threat against the judge would not affect the sentencing, and that the judge was not biased or prejudiced against Brown.

Whether a trial judge should grant a motion for disqualification is left to the sound discretion of the judge. *Sivak v. State*, 112 Idaho 197, 206, 731 P.2d 192, 201 (1987). Applying the analysis of *State v. Hedger*, we conclude that the trial judge did not abuse his discretion by not disqualifying himself.

### VI.

### THE TRIAL COURT DID NOT ABUSE ITS DISCRETION BY NOT GRANTING THE DEFENDANT'S REQUEST TO BE EXAMINED BY AN EXPERT OF THE DEFENDANT'S CHOICE CONCERNING HIS MENTAL CAPACITY.

■ Brown asserts that the trial court should have granted his request to be ex-

amined by an expert of Brown's choice concerning his mental capacity. We conclude that the trial court did not abuse its discretion in denying this request.

Pursuant to Brown's prior request, the trial court appointed a psychiatrist to examine Brown to determine whether, as the result of mental disease or defect, Brown lacked capacity to understand the proceedings against him or to assist in his own defense. After examining Brown, the psychiatrist reported that Brown was not mentally ill and had the capacity to understand the proceedings against him and to assist in his own defense. At the sentencing hearing, Brown requested to be examined by an expert of his own choice.

In making this request, Brown's attorney mentioned only that Brown and his attorney were not satisfied with the first psychiatrist's report and that the psychiatrist spent less than an hour and a half with Brown. In denying the request, the trial court noted that Brown had been examined by both a psychologist and a psychiatrist appointed by the trial court, that the sentencing had been delayed many times, and that it was time to move forward. The trial court then stated: "We have as extensive as I have ever seen, more extensive— much more extensive record at this point of evaluations by various mental health specialists...."

The trial court's decision whether to appoint another psychiatrist to examine Brown was a matter of discretion. *State v. Olin*, 103 Idaho 391, 395, 648 P.2d 203, 207 (1982). Applying the analysis of *State v. Hedger*, we conclude that the trial court did not abuse its discretion by not granting Brown's request for a further examination by an expert of his choice.

### VII.

### THE SENTENCE WAS NOT UNREASONABLE OR CRUEL AND UNUSUAL PUNISHMENT.

■ Brown asserts that the sentence he received was unreasonable or cruel and unusual. We disagree.

Recently, we have restated and clarified the standards we apply in determining whether a sentence is unreasonable:

In determining whether a sentence is excessive ..., we review all the facts and circumstances in the case and focus on whether the trial court abused its discretion in fixing the sentence.

. . . .

[T]he general objectives of sentence review are:

(i) to correct the sentence which is excessive in length, having regard to the nature of the offense, the character of the offender, and the protection of the public interest;

(ii) to facilitate the rehabilitation of the offender by affording him an opportunity to assert grievances he may have regarding his sentence;

(iii) to promote respect for law by correcting abuses of the sentencing power and by increasing the fairness of the sentencing process; and

(iv) to promote the development and application of criteria for sentencing which are both rational and just.

. . . .

Where reasonable minds might differ as to the sufficiency of time of confinement, the discretion vested in the sentencing court in imposing sentence will be respected. Our task is one of deciding whether a clear abuse of that discretion has been affirmatively shown and the question is whether the sentence is unreasonable upon the facts of the case. To establish that the sentence imposed was improper, the defendant must show that in light of the governing criteria, [the] sentence was excessive under any reasonable view of the facts.

*State v. Broadhead,* 120 Idaho 141, 143–145, 814 P.2d 401, 403–405 (1991) (citations omitted).

In imposing the fixed life sentence in this case, the trial court stated:

In my opinion this is as severe and violent a crime as I have ... experienced in my time on the bench or at the bar. It is a crime that—both from the standpoint of society and the victim does cry out for ... a severe measure of retribution. The deterrent effect I have already indicated.

Or if the offender ... so utterly lacks rehabilitative potential that imprisonment until death is the only feasible means of protecting society. The only possibility of rehabilitation that we have is highly speculative. This in my opinion is an case where there is no feasible means of protecting society other than separation of the defendant from society in a secure facility.

... [I]t's the sentence of the court in considering the acts that have been previously outlined by the court in connection with this rape and ... when considering the background of the defendant, the other cases of sexual abuse along with the psychological psychiatric reports, the reports of the defendant's incarceration as a juvenile, that this court should impose the maximum possible penalty for this offense.

Applying the standards in *Broadhead,* we focus on the reasonableness of the view that a fixed life sentence is necessary to protect society from Brown. We adhere to the test that "[w]here reasonable minds might differ ... the discretion vested in the sentencing court ... will be respected." *Broadhead,* 120 Idaho at 145, 814 P.2d at 405. We conclude that it was a reasonable view of the facts for the trial court to conclude that a fixed life sentence is necessary.

In *Broadhead,* in considering whether the sentence constituted cruel and unusual punishment under the eighth amendment, we followed analysis dictated by *Solem v. Helm,* 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). 120 Idaho at 148, 814 P.2d at 408. Shortly after our decision in *Broadhead,* the United States Supreme Court modified the proportionality requirement of the eighth amendment set forth in *Solem. Harmelin v. Michigan,* — U.S. ——, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991). The decision in *Harmelin* was fractured, with two members of the Supreme Court writing to overrule the proportionality requirement of *Solem* and three members writing to modify the re-

quirement. We perceive, however, that *Harmelin* seriously erodes the three-step proportionality analysis in *Solem*. Following the opinion of Justice Kennedy, in which Justices O'Connor and Souter joined, we first must make a threshold comparison of the crime committed and the sentence imposed to determine whether the sentence leads to an inference of gross disproportionality. —— U.S. at ——, 111 S.Ct. at 2707.

After reviewing all the facts and circumstances of the case, we conclude that Brown's sentence does not lead to an inference of gross disproportionality. Therefore, there is no necessity to make any further proportionality review under the eighth amendment.

 In *Broadhead*, we relied on *State v. Evans*, 73 Idaho 50, 245 P.2d 788 (1952), which held that under our state constitution a criminal sentence is cruel and unusual punishment only when it is "out of proportion to the gravity of the offense committed, and such as to shock the conscience of reasonable [people]." *Broadhead*, 120 Idaho 141, 148, 814 P.2d 401, 408. This traditional Idaho constitutional rule focusing on the gravity of the offense is well established and appropriate and is essentially equivalent to the "grossly disproportionate" test used by Justice Kennedy's opinion in *Harmelin*. Because, in *Broadhead*, we based our decision on *Solem* to support expanding the proportionality analysis to the sentences of other defendants within and without the state of Idaho, we overrule *Broadhead* to the extent it relies on *Solem*. In this respect, *Broadhead* suffers the same infirmity as did *Solem* prior to its demise in *Harmelin*.

 We limit our proportionality analysis to death penalty cases and, under the Idaho Constitution as contemplated in *State v. Evans*, to those cases which are "out of proportion to the gravity of the offense committed" in the cruel and unusual punishment setting similar to the

"grossly disproportionate" analysis of the eighth amendment urged by Justices Kennedy, O'Connor, and Souter in *Harmelin*. The lack of objective standards for evaluating differing terms of imprisonment, *see Harmelin*, 111 S.Ct. at 2704–05, gives proportionality review outside these two limited areas the potential of essentially allowing, if not requiring, this Court to second guess the trial court's discretionary determination of the criminal sentence that best fits the criminal defendant and the crime within the reasonable limits of the sentencing options.

The gravity of the offense in this case was very great. Brown not only raped the victim but almost killed her. Only remarkable medical procedures saved her life. While this is not a homicide case, it might well have been. We conclude that Brown's sentence is not out of all proportion to the gravity of the offense, nor is the sentence so severe as to shock the conscience of reasonable people.

## VIII.

## CONCLUSION.

We affirm the convictions and the sentence.

BAKES, C.J., BISTLINE and BOYLE, JJ., and MICHAUD, J. Pro Tem., concur.

BISTLINE, Justice, concurring and specially concurring.

But for the majority upholding the district court ruling that it could and would consider Brown's juvenile records in sentencing him, in Part III of the Court's opinion, I would fully concur in Justice Johnson's opinion. These juvenile records consist of several reports from mental health professionals on Brown's mental health and amenability to treatment. The majority concludes I.C. § 16–1816[1] did not bar the district court from considering Brown's juvenile records. I do not see that

---

1. Brown's case falls under the former version of I.C. § 16–1816. This statute was twice amended in 1990. One amendment became effective on July 1, 1990, and is effective until July 1, 1993.

The second amendment is effective after that expiration of the first. Brown's sentencing hearing was held in 1989.

any of these reports were the least bit necessary.

Idaho Code § 16–1816 prohibits dissemination of such information without the express order of the juvenile court.[2] That statute provides in relevant part that:

All information obtained and social records prepared in the discharge of official duty by an employee of the court **shall not be disclosed** directly or indirectly to anyone other than the court or others entitled under this act to receive such information, **unless and until otherwise ordered by the court.**

I.C. § 16–1816 (emphasis added). The statute allows dissemination of the "facts contained in such reports" to be released to "persons and governmental and private agencies and institutions conducting pertinent research studies or having a legitimate interest in the protection, welfare or treatment of the child." On the order of the district court, pursuant to motion of the prosecutor, the reports were released to the adult court, the prosecutor and the presentence investigator, none of whom were entitled under the act to that information and none of whom were conducting "pertinent research studies" or had "a legitimate interest in the protection, welfare and treatment of the child." Their interest was in determining the appropriate punishment for Brown the adult and the necessary measure of the protection for the public. The day had long passed by for any consideration of rehabilitating Brown the child.

Unfortunately, the majority opinion shows no concern for the deleterious effect Part III of the opinion will have on the juvenile courts of the State. Although the version of I.C. § 16–1816 at issue here has been repealed, the version effective until July 1, 1993, is similar to the former statute and the majority's opinion may be looked to for guidance in interpreting the current statute. Thus, when defense attorneys realize that their juvenile clients' social and clinical studies will probably be available to those outside the juvenile system, they may advise their clients to not participate in those evaluations. It would be malpractice, in the view of some, for attorneys to fail to at least advise their juvenile clients of this possibility and some children may decide not to participate in those studies even though their attorneys think it may be in the child's best interest to obtain such an evaluation. Further, it will only be a matter of time before this Court will have to decide whether such studies are the functional equivalent of interrogation requiring *Miranda*[3] warnings. The United States Supreme Court in *Estelle v. Smith*, 451 U.S. 454, 469, 101 S.Ct. 1866, 1876, 68 L.Ed.2d 359 (1981), held that psychological evaluations used to determine whether the death penalty should be imposed must be preceded by *Miranda* warnings.

Children who now fully cooperate with the mental health professionals will be running the risk of increased confinement, should they commit an offense when they become adults. Those who do not cooperate will risk having juvenile jurisdiction waived. One of the factors used in deciding whether to waive juvenile jurisdiction is "[t]he likelihood of rehabilitation of the child...." In other words, the majority places children in a Catch–22 by discouraging them from being honest and forthright with those who have their best interest at heart for fear that their confidences will be automatically accessible to those who may later seek to punish them.

Because it will reduce the rehabilitative options available to the juvenile courts, the opinion for the Court is capable of producing a result contrary to what the legislature contemplated. On the other hand, a reading of I.C. § 16–1816 which prohibited the dissemination of information for sentencing purposes without the permission of the juvenile court would be in harmony with the legislative policy set out in the Youth Rehabilitation Act. One of the pri-

---

**2.** To avoid any confusion, the district court sitting in juvenile jurisdiction will be called "juvenile court" and the district court sitting in general jurisdiction will be called "adult court."

**3.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

mary purposes of the YRA is to provide for "professional assistance to courts handling children's cases, through a coordinated program of rehabilitation...." I.C. § 16–1801. Children will be more likely to fully and honestly participate in the studies if they know their records are not automatically accessible by the adult system. This will increase the chances that a youthful offender will be successfully handled within the juvenile system.

Such an interpretation is also in keeping with the dictates of I.C. § 16–1844 which requires the YRA to be "liberally construed to the end that the legislative policy expressed herein is achieved." An interpretation which maximizes the amount of information deemed confidential would further the rehabilitative purpose of the YRA.

There is no need to address the admissibility of the records under the facts of this case for as the Solicitor General noted in his brief, "the juvenile records played little, if any, role in the defendant's sentencing. His post-juvenile behavior and the facts and circumstances of the crime were far more damning than anything appearing in the juvenile records. The court essentially ignored the juvenile records, and reversible error [cannot] be predicated upon them."

In light of the above discussion, this author would not have reached the issues of whether I.C. §§ 54–2314, 54–3213 or I.R.E. 503(b)(2) barred the production of the records. The majority should have shown the same amount of judicial restraint.

Although this Court is in unanimous agreement that Brown is a bad character, one who is in more need of incarceration than the average person who has committed a crime, a genuine concern of this one Justice is the adverse effect upon juveniles generally, who otherwise might cooperate more openly with Health and Welfare officials attempting to help them. Although Brown's future is fixed, it would be so even if this Court did not approve the district court's ruling making juvenile records readily available at sentencing, a result the majority need not reach under the harmless

error doctrine and a result not supported by law or public policy.