137 P.3d 466

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Thomas Wendell HELMS, Defendant–Appellant.**

**No. 30460.**

Court of Appeals of Idaho.

Jan. 6, 2006.

Review Denied April 28, 2006.

Molly J. Huskey, State Appellate Public Defender; Jason C. Pintler, Deputy Appellate Public Defender, Boise, for appellant.

Hon. Lawrence G. Wasden, Attorney General; Carol L. Chaffee, Deputy Attorney General, Boise, for respondent.

LANSING, Judge.

The district court imposed on Thomas Wendell Helms a fixed life sentence, which included a persistent violator sentence en-

hancement, for battering a correctional officer by throwing toilet water on the officer. Helms appeals, contending that the sentence is excessive. We conclude that this severe sentence is so disproportionate to the offense for which it was imposed that the sentence must be reduced.

## I.

## BACKGROUND

In March 2003, while incarcerated at the Idaho Maximum Security Institution on sentences for grand theft, felony possession of a dangerous weapon by an inmate, and battery with intent to commit murder, Helms became involved in a scuffle with two correctional officers. Helms had been treated for self-inflicted wounds to his arm several days earlier. On the day in question, he attracted the attention of correctional officers by pulling the stitches out of his arm, rubbing his blood on a towel, and hanging the towel in his cell window. The officers determined that they needed to move Helms from his cell for medical treatment. Prison procedures required that Helms be restrained before being removed from his cell. An officer therefore asked Helms to submit to handcuffing, and he agreed to do so. As the officer moved to secure handcuffs on Helms, however, Helms jerked away, grabbed a nearby cup, and threw a liquid on the correctional officers. The liquid—apparently water from Helms's toilet—hit one officer in the face and left side, and hit another low on his right side. Both officers immediately went through decontamination procedures and medical tests to ensure that they had not contracted any pathogens such as HIV or hepatitis. The tests were negative.

For throwing water on the officers, Helms was charged with battery on a correctional officer, a felony under Idaho Code § 18–915(c). The charging information also alleged that Helms was subject to a sentence enhancement of up to life imprisonment under I.C. § 19–2514 for being a persistent violator. He was convicted following a jury

trial. At the sentencing hearing the prosecutor recommended a unified twenty-year sentence composed of a five-year fixed term followed by fifteen years indeterminate. Defense counsel requested a five-year fixed sentence with no indeterminate term. The district court elected, however, to impose a determinate life sentence, including the sentence enhancement, citing Helms's serious and extensive criminal record to justify this maximum punishment. Helms appeals this sentence, contending that a determinate life sentence is unreasonable for this offense.[1]

## II.

## ANALYSIS

Appellate review of the length of a sentence is governed by an abuse of discretion standard. *State v. Hedger*, 115 Idaho 598, 604, 768 P.2d 1331, 1337 (1989); *State v. Toohill*, 103 Idaho 565, 568, 650 P.2d 707, 710 (Ct.App.1982). In applying that standard, "reasonableness" is a fundamental requirement. *Id.* The objectives of sentencing, against which the reasonableness of a sentence is to be measured, are the protection of society, the deterrence of crime, the rehabilitation of the offender, and punishment or retribution. *Id.* On appellate review, it is our responsibility to conduct an independent examination of the facts, focusing upon the nature of the offense and the character of the offender. *State v. Young*, 119 Idaho 510, 511, 808 P.2d 429, 430 (Ct.App.1991). We will find that the trial court abused its sentencing discretion if, in light of the objectives of sentencing, the imposed sentence is excessive under any reasonable view of the facts. *State v. Charboneau*, 124 Idaho 497, 499, 861 P.2d 67, 69 (1993); *State v. Brown*, 121 Idaho 385, 393, 825 P.2d 482, 490 (1992).

In this case, the underlying offense involved a battery upon a correctional officer. Under Idaho law, a battery of the type perpetrated here would be a misdemeanor subject to a maximum sentence of six months in the county jail but for the fact that the victims were correctional officers. *See* I.C.

---

1. Helms does not argue that his sentence violates state or federal constitutional prohibitions against cruel and unusual punishment. Therefore, we do not engage in a constitutional analysis.

§§ 18–903, 18–904. Helms's offense was elevated to a felony by terms of I.C. § 18–915(c), which provides that a battery committed against certain categories of victims, including correctional officers, is a felony.[2] Even as thus constituting a felony, in the absence of a persistent violator enhancement the conduct is punishable by no more than five years of imprisonment. I.C. § 18–915(c). For comparison purposes, we also note that I.C. § 18–915B, which makes it a felony for an inmate to propel bodily fluid or bodily waste at a correctional officer, authorizes a maximum sentence of five years; and an aggravated battery on a correctional officer in which an officer sustains great bodily harm, permanent disability or permanent disfigurement, is subject to a thirty-year maximum sentence. I.C. §§ 18–907, 18–908, 18–915(b).

Idaho's persistent violator statute, I.C § 19–2514, authorizes a court to sentence a third-time felon to a greater term than otherwise would have been permissible for the new offense. This statute mandates a minimum sentence of five years and authorizes a maximum sentence of life imprisonment for a felon who has at least two prior felony convictions.[3] Section 19–2514 is a clear expression of legislative policy that a recidivist should be subject to more severe punishment than a first offender would be. The statute "raise[s] the bar so to speak, by broadening a judge's possible sentencing options." *State v. Harrington*, 133 Idaho 563, 567, 990 P.2d 144, 148 (Ct.App.1999). Persistent violator status is not an additional charge, but replaces the ordinary sentencing range for the underlying conviction. *See State v. Johnson*, 86 Idaho 51, 57, 383 P.2d 326, 329 (1963); *State v. Martinez*, 107 Idaho 928, 929, 693 P.2d 1130, 1131 (Ct.App.1985); *State v. Greensweig*, 102 Idaho 794, 800, 641 P.2d 340, 346 (Ct.App.1982).

A determinate life sentence is the harshest penalty that may be imposed for any crime, save for the death sentence. An inmate given a fixed life sentence receives no consideration for good behavior, successful rehabilitative treatment, mellowing of age, or any other mitigating factor that may evolve over time. Absent executive commutation, an inmate with such a sentence will die in prison. Given the gravity of such a punishment, we have stated that a fixed life sentence is appropriate in only two situations: "if the offense is so egregious that it demands an exceptionally severe measure of retribution and deterrence, or if the offender so utterly lacks rehabilitative potential that imprisonment until death is the only feasible means of protecting society." *State v. Eubank*, 114 Idaho 635, 638, 759 P.2d 926, 929 (Ct.App. 1988).

In the present case, the conduct of throwing toilet water on two correctional officers is clearly not a crime that justifies a determinate life sentence. The behavior no doubt caused distress to the victims, particularly because they could have been exposed to serious diseases even as they were trying to secure medical help for their attacker. They required medical screening for a period to insure that there were no health effects. This battery is not to be condoned or excused, but it is far removed from the crimes of appalling violence or depravity that typically are punished with a fixed life term. If this offense had occurred outside a correctional setting and if the victims had not been within the categories enumerated in I.C. § 18–915, it likely would not have been prosecuted at all. And, if Helms had not been a consistent troublemaker at the prison, this episode probably would have been handled as an internal prison disciplinary matter. Manifestly, a fixed life sentence in this case far

---

2.  Idaho Code § 18–915 provides:
    Any person who commits [a battery] ... against or upon a ... correctional officer ... and the perpetrator knows or has reason to know of the victim's status ... the offense shall be a felony punishable by imprisonment in a correctional facility for a period of not more than five (5) years, and said sentence shall be served consecutively to any sentence being currently served.

3.  Idaho Code § 19–2514 provides:
    Any person convicted for the third time of the commission of a felony ... shall be considered a persistent violator of law, and on such third conviction shall be sentenced to a term in the custody of the state board of correction which term shall be for not less than five (5) years and said term may extend to life.

exceeds that which is necessary to punish the offense, to deter Helms or others from like conduct, or to protect correctional officers in the line of duty. No reasonable person could come to a conclusion that the nature of this offense, standing alone, justifies a determinate life sentence.

It may be argued, however, that applying the second component of the standard articulated in *Eubank*, life imprisonment for Helms is justified because he so utterly lacks rehabilitative potential that the protection of society requires his permanent incarceration. It is fair to say that Helms is very dangerous, and the prospect of meaningful rehabilitation is remote at best. He has committed several serious crimes, both inside and outside of prison. His offenses began when he was a juvenile in Washington. His juvenile offenses included trespass, theft, reckless burning, and three counts of rape of a child. He has been imprisoned in Idaho since 1995, when he received a fourteen-year sentence for grand theft and a concurrent one-year jail sentence for petit theft. The sentences were initially suspended, but he soon violated probation and was incarcerated. Since then, he has been a highly volatile inmate and has committed additional offenses that have extended his aggregate term of incarceration by more than two decades. After his 1995 arrest for probation violations, Helms was convicted of felony injury to a jail for destroying the sink and toilet in his cell and breaking windows. He apparently engaged in similar, although uncharged, behavior at an earlier time, and injured an officer when he threw a porcelain shard. While imprisoned, Helms was convicted of felony battery with intent to commit murder as a result of an attack that seriously injured a fellow inmate. He battered another inmate in the transport holding facility at the Ada County Courthouse, and was convicted of felony possession of a dangerous weapon by an inmate. So far as we can discern from the record, before he was sentenced for the present offense, Helms's aggregated sentences required his imprisonment for more than twenty years, with indeterminate terms extending more than an additional decade. Beyond his serious crimes, he also has a history of disruptive behavior for which he has lost privileges and has been placed in increasingly restrictive confinement. This behavior includes episodes of self-mutilation, destruction of property, refusal to follow directions of Department of Correction staff, indecent exposure, threats, throwing feces and urine, assault, and the like. Helms has also bragged to investigators about feats of murder and cannibalism during one of the brief periods in his life when he was not incarcerated; it is unclear whether these are true crimes or mere fantasy. Helms admits to having "evil thoughts," desiring to hurt a lot of people, and wanting to commit a notorious crime.

Helms's extraordinary history of criminal and disruptive behavior may be a product, at least in part, of mental or physical abnormalities. He has been mentally abnormal since childhood, with a long list of symptoms that apparently resist firm medical diagnosis, including auditory and visual hallucinations, pyromania, hyper-sexuality, attention deficit hyperactivity disorder, learning disabilities, and cycles of unpredictable behavior. He has also been diagnosed with Klinefelter's syndrome, a genetic defect giving him an "XXY" chromosome constitution instead of the usual "XY." The syndrome is associated with a slightly lowered IQ, learning disabilities, female body characteristics, infertility, and emotional problems.[4] He has received intermittent testosterone replacement therapy and has been periodically placed on various medications, but none of this therapy appears to have significantly altered his behavior. It is possible, of course, that medical science will develop a helpful treatment for him at some time in the future. That said, we have no illusions about Helms's character or potential for rehabilitation; it is very doubtful that he will ever be a productive member of society.

Nevertheless, we cannot say that his poor character or mental disorders warrant a fixed life sentence for throwing toilet water. Although we have said that a determinate life

---

4. Some studies also suggest that criminal behavior is associated with Klinefelter's syndrome, although it is not the only factor. Vickie Buettner, "Klinefelter's Syndrome," August 1994.

sentence may be justified by either of two factors—either because the offense is so heinous that it demands severe punishment, or because the offender utterly lacks rehabilitative potential, *Eubank,* 114 Idaho at 638, 759 P.2d at 929—we have never considered a case where a determinate life sentence was imposed solely on the second factor in absence of a serious or violent underlying crime. In some cases, we have upheld determinate life sentences based only upon the egregious nature of the offenses. *See State v. Butcher,* 137 Idaho 125, 137, 44 P.3d 1180, 1192 (Ct.App.2002) (upholding a fixed life sentence for the execution-style killing of a sleeping victim); *State v. Jensen,* 137 Idaho 240, 245, 46 P.3d 536, 541 (Ct.App.2002) (affirming a life term for first degree murder). At other times, Idaho appellate courts have considered the two factors in tandem, noting that a serious crime and the defendant's character warranted this severe penalty. *See State v. Cross,* 132 Idaho 667, 671–72, 978 P.2d 227, 231–32 (1999) (affirming a determinate life sentence for multiple counts of lewd conduct based on the nature of the offenses, the presentence psychological evaluation and report, past criminal history which included sexual abuse of a minor, and the minimal likelihood of rehabilitation); *State v. Lewis,* 123 Idaho 336, 352–53, 848 P.2d 394, 410–11 (1993) (affirming a determinate life sentence for lewd conduct with a minor where the defendant was HIV-positive and had been convicted of a similar offense); *State v. Hibbert,* 127 Idaho 277, 278, 899 P.2d 987, 988 (Ct.App.1995) (affirming a determinate life sentence where defendant violently and repeatedly sexually assaulted his daughter, effectively imprisoned her in the home, had a felony record of sexual assault, and made death threats against the prosecutor and his daughter). In all of these cases, the serious nature of the crime was an important factor in justifying a determinate life term.

Even when there have been serious questions about the defendant's character and potential for rehabilitation, our appellate courts have held fixed life sentences to be excessive, based upon the nature of the crime. Two such cases are instructive. In *State v. Jackson,* 130 Idaho 293, 939 P.2d 1372 (1997), the defendant pleaded guilty to lewd conduct with a minor under sixteen. He had forced his stepdaughters to touch his genitals and move back and forth while sitting on his penis, but the girls were always dressed and there was a blanket between the defendant and his victims. There was no penetration and no threats of violence. He also had one other charge in his record of sexually abusing his daughters several years before. The Idaho Supreme Court held that a determinate life term was unreasonable, noting that "the behavior exhibited . . . while reprehensible, is not so egregious that [the defendant] should die in prison." *Id.* at 295–96, 939 P.2d at 1374–75. The defendant in *Eubank,* 114 Idaho at 636, 759 P.2d at 927, was a persistent violator convicted of burglary and sexual abuse of a child. The court held that a determinate life term was unreasonable because although the facts of the crime "portray wrongful and frightening conduct . . . they do not fit the pattern of cases in which fixed life sentences have been upheld." *Id.* at 637, 759 P.2d at 928. The court also noted that Eubank's long criminal record, which included many petty offenses, assault with a deadly weapon, and assault with intent to commit rape, was not sufficient to justify a fixed life sentence.

Our research has disclosed no case where we have affirmed a determinate life sentence based solely on the character of the offender and without finding support for the sentence in the seriousness of the offense. To do so, in our view, would violate sentencing principles that require consideration of *both* the nature of the offense *and* the character of the offender. Although a defendant's character and criminal history are highly significant factors for the court's consideration in fashioning a sentence, ultimately the defendant is sentenced for his crime, not for his character. While there is no statutory barrier to a fixed life sentence in this case, Idaho's sentencing standards do not permit its courts to impose a fixed life sentence for the sort of battery that occurred here.

Helms was sentenced for throwing toilet water at his guards. Because he is a persistent violator with a history of nearly continuous criminality and agitation, he can and should be punished at a higher level than

would otherwise be appropriate, but his crime does not justify the most severe penalty that the State can impose short of the death penalty. Therefore, we conclude that Helms's sentence must be modified to a lesser determinate term followed by an indeterminate life term, to run consecutive to the other sentences he was serving when his conviction was entered. Such a sentence will allow the parole board to consider Helms for parole when his aggregate fixed terms of approximately thirty-five years have been served, but the indeterminate life component will allow the board to *deny* parole if Helms is never deemed safe for release into society. Contrary to the implication in the dissenting opinion, such a sentence will not set Helms free to prey upon society; he may be held in prison for the remainder of his life if the parole board never finds him to be trustworthy for release on parole.

Accordingly, Helms's sentence is hereby modified to a unified life sentence with a fifteen-year determinate term to run consecutive to his preceding sentences.

Judge GUTIERREZ concurs.

Chief Judge PERRY, dissenting.

I respectfully dissent. The Idaho legislature has entrusted to law enforcement, prosecutors, the courts, the Department of Corrections, and the Parole Commission the responsibility to protect the citizens of the state. This solemn duty so entrusted extends to future potential victims. Repeat habitual violent offenders who cannot conform their conduct to society should not be set free to prey upon it. To this end, the legislature has provided the courts with a statute designed to address the problem presented by those individuals who persist in engaging in behavior detrimental to society. Idaho Code Section 19–2514, the persistent violator statute, allows Idaho courts the necessary discretion for crafting a sentence appropriate for repeat offenders and provides:

Any person convicted for the third time of the commission of a felony, whether the

previous convictions were had within the state of Idaho or were had outside the state of Idaho, shall be considered a persistent violator of law, and on such third conviction shall be sentenced to a term in the custody of the state board of correction which term shall be for not less than five (5) years and said term may extend to life.

Before the district court below, and before this Court now, is Helms, a sexual predator and a repeat violent offender. As a persistent violator, Helms is exactly the type of individual I.C. § 19–2514 was intended to deal with.

The majority attempts to justify its arbitrary reduction of Helms's sentence to fifteen years fixed for two reasons. First, the majority downplays the instant offense and Helms's substantial criminal record. Second, the majority expresses the view that this Court has never considered a case where a fixed life sentence was imposed solely on the character of the offender and therefore it will always be, in every case, improper. I find neither of these to be persuasive in the particular situation of Helms who pled guilty to not only the underlying crime, but also admitted to being a persistent violator, subject to a fixed life sentence.[1]

An appellate review of a sentence is based on an abuse of discretion standard. *State v. Burdett,* 134 Idaho 271, 276, 1 P.3d 299, 304 (Ct.App.2000). Where a sentence is not illegal, the appellant has the burden to show that it is unreasonable and, thus, a clear abuse of discretion. *State v. Brown,* 121 Idaho 385, 393, 825 P.2d 482, 490 (1992). A sentence may represent such an abuse of discretion if it is shown to be unreasonable upon the facts of the case. *State v. Nice,* 103 Idaho 89, 90, 645 P.2d 323, 324 (1982). Upon review of a sentence the issue is not whether the sentence is one that this Court would have imposed, but whether the sentence is plainly excessive under *any* reasonable view of the facts. *State v. Toohill,* 103 Idaho 565, 568, 650 P.2d 707, 710 (Ct.App.1982). If reasonable minds might differ as to whether the sentence is excessive, we are not free to substitute our view for that of the district

---

1. The majority does not hold that, if a fixed life sentence was permissible for this offense, the

district court would have acted outside its discretion in imposing it upon Helms.

court. *Id.* We must defer to the discretion of the district court so long as that discretion was not abused. *See Burdett,* 134 Idaho at 276, 1 P.3d at 304.

Where an appellant contends that the sentencing court imposed an excessively harsh sentence, we conduct an independent review of the record, having regard for the nature of the offense, the character of the offender and the protection of the public interest. *State v. Reinke,* 103 Idaho 771, 772, 653 P.2d 1183, 1184 (Ct.App.1982). However, a fixed life sentence may be held reasonable if the nature of the offense is so egregious that it warrants an exceptionally severe retribution *or* the character of the offender utterly lacks rehabilitative potential, making life imprisonment the only reasonable means of protecting society. *State v. Eubank,* 114 Idaho 635, 638, 759 P.2d 926, 929 (Ct.App.1988). The four, well-established objectives of criminal punishment in Idaho are: the protection of society; deterrence of the individual and the public generally; the possibility of rehabilitation; and punishment or retribution for wrongdoing. *State v. Stover,* 140 Idaho 927, 933, 104 P.3d 969, 975 (2005); *Toohill,* 103 Idaho at 568, 650 P.2d at 710. However, as a matter of policy, the primary consideration in sentencing must always be the protection of society. *State v. Hunnel,* 125 Idaho 623, 627, 873 P.2d 877, 881 (1994). All other purposes and objectives of sentencing must be subservient to this cause. *Id.* Given these objectives, when sentencing under the persistent violator statute, even if the instant crime is not so egregious that it would, by itself, support a fixed life sentence, the sentencing court must still review the character of the offender and make a decision that primarily serves to protect society above all else. *See Eubank,* 114 Idaho at 638–39, 759 P.2d at 929–30. A fixed life sentence based primarily upon an evaluation of character is acceptable only if the sentencing court can determine, with a high degree of certainty, that the perpetrator can never be safely released into society. *Id.* at 638, 759 P.2d at 929. Considering the above criteria, I conclude the majority's opinion today is directly contrary to this Court's opinion in *Eubank* when the majority suggests that imposing a life sentence under the persistent violator statute based on the character of the offender alone is improper.

The question before this Court in the instant case is whether the sentencing court could reasonably find with a high degree of certainty that Helms, as a persistent violator, could never be safely released into society, regardless of the nature of the instant crime before the court. Therefore, I believe it is important to review the entire picture of Helms's character as placed before the district court. Only then can we consider whether its exercise of discretion was reasonable.

Helms was identified in kindergarten as having behavioral management problems. By the age of twelve, Helms had a history of lying, stealing, and fire-starting. He had also undergone psychiatric treatment, including inpatient treatment at a hospital for the mentally ill. The last time he attended a public school (middle school), he was caught stealing supplies and selling marijuana. By 1989, Helms had juvenile dispositions for criminal trespass, theft, and taking a motor vehicle without permission. His parents could no longer control him and arranged for fourteen-year-old Helms to live with a private foster care family.

Within a few months of staying with the foster care family, Helms sexually violated their six-year-old daughter (who was also his half-sister) and coerced her nine-year-old brother (who was Helms's half brother as well) to also sexually molest her. When confronted with his actions, Helms readily admitted the conduct, showed no remorse, and stated: "I did it. So what?" While investigating this crime, authorities discovered Helms had previously sexually molested his younger brother who still lived with his parents. He had also threatened his brother with a knife.

Helms pled guilty to three counts of child rape and was placed in the custody of a juvenile detention/therapy facility. While in detention, psychologists diagnosed Helms for the first time as a sexual predator with a high likelihood of reoffending, although it would not be the last time. During his first stay in detention, Helms frequently made

sexually inappropriate remarks to female detainees and staff, often acted aggressively or disruptively, and was disciplined on a regular basis. Helms also began a pattern of threatening to injure himself to gain the total attention of the staff. Helms underwent sexual offender treatment but, even at the time of his parole in 1991, his discharge summary indicated he would likely reoffend.

Understandably, once paroled, Helms's parents would not allow him to live with them as his younger brother, and former sexual assault victim, was living in the household. Helms was admitted to the Therapeutic Adolescent Program (TAP), a specialized foster home for troubled youth. While in TAP, Helms violated his parole by running away on three occasions and stealing money from the foster home, a crime for which he was later adjudicated. Because of this behavior he was asked to leave TAP. In 1992, Helms returned to his parents' home where he continued to lie, steal, and emotionally manipulate those around him. Shortly after his return, Helms attempted to burn down the garage. He was adjudicated for first degree reckless burning and put into another juvenile detention facility. Helms was paroled again in 1993. He violated his parole by having unsupervised contact with a minor child. At this time his parole officer stated in a written report that Helms was "a very cold individual who has absolutely no conscience and does not care what he does to others."

In 1994, Helms failed to register as a sex offender and committed criminal trespass in Washington. While those cases were pending, he drifted to Idaho where he committed grand and petit theft. He pled guilty to the Idaho crimes. A pre-sentence investigation report showed that Helms's parents felt he had no remorse or conscience. Helms was incarcerated on the theft charges.

Even within the highly-structured environment of the prison system, Helms's criminal behavior not only continued unabated but increased. In 1995, Helms attempted to slash the throat of another inmate but did not seriously injure the victim. Helms was found guilty and sentenced for felony possession of a weapon by an inmate. In 1998,

Helms and an accomplice devised a plan to murder another inmate. Helms and his partner ambushed the victim in his cell and began beating him. Helms pulled out a razor and slashed the victim's face, arms, body, and neck in an attempt to murder him by slitting his throat. Correctional officers intervened before the victim was killed. By his own admission after the incident, Helms described to the investigating officer how, if the attack had not been stopped, he had planned to eviscerate the victim, pulling out his internal organs, cutting them up, spreading them around the cell and eating some of them. According to Helms, these actions would have been undertaken in order to make the murder scene as grisly as possible so as to emulate the gruesomeness of the scene of the "Manson murders" in *Helter Skelter*. Helms was found guilty of this crime and sentenced to a fifteen-year fixed term to be served consecutive to his other sentences. In 2003, Helms destroyed his cell toilet and sink. He was charged with felony injury to jails and received a five-year consecutive sentence. While waiting in a courthouse transport holding room, Helms slipped out of his belly chain and physically assaulted another inmate.

In addition to the notable crimes above, Helms's history of incarceration is replete with other incidents of severe disruptive and violent behavior. He has engaged in self-mutilation numerous times, including carving phrases like "bug for life" and "Helter Skelter Manson" into his own flesh. Helms has engaged in a seemingly unending series of institutional violations including: flooding his cell, destroying cell door windows, shattering food trays, masturbating while in view of correctional officers, and repeatedly disobeying orders and verbally abusing or threatening staff. In the course of his prison career, Helms has also assaulted correctional officers with urine, feces, a piece of broken toilet porcelain, fists and toilet water, including the instant offense. Altogether, Helms has received a total of fifty-four disciplinary offense reports while in prison.

Helms has repeatedly displayed a fascination with death and ideation of homicide and cannibalism. In 2000, Helms told an investi-

gator that in 1994 he had helped commit the murder of a female African–American prostitute and subsequently ate her heart after assisting in cutting her body into pieces. He also confessed to the murder of another man during this same period. Admittedly, there exists no evidence to corroborate any of Helms's frightening claims. Even the investigator commented that these were either fantasies Helms would act out upon release, fabrications, or the truth. However, when asked in 2003 about these previous admissions, Helms again affirmed they were true, that he was part of a satanic cult at that time, and had engaged in murder and cannibalism.

Helms has also idolized Charles Manson and has in the past expressed a desire to gain a similar level of notoriety as well by committing an act that would give him a life sentence or the death penalty. This desire was at least partially the motivation for the attempted murder in 1998. Regarding this earlier crime, Helms later remarked that the victim was chosen essentially because he was simply there and if Helms was going to kill someone the chosen victim was sufficient.

Though never conclusively diagnosed as being a sociopath, Helms has a long history of mental illness and treatment. In 1993, Helms was diagnosed with the genetic disorder, Klinefelter's syndrome. As the majority has already pointed out, this condition has burdened Helms with several physical and mental problems. Throughout his life, Helms has also shown various symptoms of, or has been diagnosed with, a wide variety of mental disorders over the course of his life, starting at an early age, including: borderline schizophrenia, attention deficit disorder, antisocial tendencies, visual and audio hallucinations, pyromania, depression, hyper-sexuality, delusions of grandeur, aggressive behavior and basic learning disabilities. There has never been a definite finding what, if any, connection exits between his genetic condition and his criminal behavior.

The record reveals a history of some form of medication for Helms's multitude of deficiencies off and on since 1987. Most recently Helms has been actively prescribed Prosac and Thorazine, which are an anti-depressant and anti-psychotic respectively. Additionally, he has undergone intermittent testosterone replacement therapy for his genetic condition. However, Helms has demonstrated a propensity to agree to take or undergo various treatments or therapy plans for his mental and physical problems, and then refusing to follow through, often fabricating excuses when confronted.

Throughout his life, Helms has shown a cycle of unpredictable behavior and is unable to act in a responsible manner for longer then six months at a time. Helms has been found to be highly suggestible and impulsive. He has demonstrated the capacity to behave with intense violence when acting on his impulses, none of which appear to have any pattern other than a propensity for destructive behavior. He has never demonstrated any remorse for the victims of any of his crimes nor does he appear to understand or care how his actions affect the lives of his victims.

Despite repeated, extraordinary attempts to treat him, Helms has shown little or no progress at being in any way rehabilitated. The only time it has been reported that Helms has made any headway in modifying his behavior is in the context of highly controlled environments and even this improvement has been minimal. Helms remains unrepentant in his behavior and attitude. Virtually every mental health or law enforcement authority that has dealt with Helms after his 1989 child rape dispositions has continually described him as a predator without a conscience who is at high risk to reoffend if released into an unsuspecting public. His most recent treating psychologist summed up Helms's situation best by stating: "I think [Helms] is always going to be dangerous for the rest of his life. He is unpredictable. Hard to read, He doesn't care."

One cannot be without some sympathy for someone in Helms's situation. Indeed, some persons in the penal system find themselves there because of an utter lack of resources in the mental health arena. It is unfortunate that, in perhaps too many cases, the judicial and penal system are called upon to protect society in ways better suited, but not avail-

able. Idaho's Supreme Court and legislature are currently on the cutting edge of establishing special mental health and drug courts, recognizing that, for some, these types of alternative disposition of their cases may prevent long-term incarceration in favor of treatment. Helms, however, is not in this position. The existence of shortcomings in the public mental health system does not absolve us of our duty to protect society, above all else, when considering an offender's sentence.

After reviewing Helms's lengthy history of brutal, unpredictable and predacious criminal behavior, it is unclear how the district court could have possibly had a higher degree of certainty that Helms is now, and will ever remain, a danger to society if released.[2] Helms is a sexual predator, a repeat violent offender, and an admitted persistent violator of the law. Based on the circumstances presented, I conclude that Helms has failed to demonstrate the district court abused its discretion in fashioning his sentence. The only thing I find "unreasonable" in Helms's sentence is the majority's modification of it to a fifteen-year fixed sentence. Therefore, I respectfully dissent.

2. Although it is possible the Parole Board may deny Helms parole in the future, that is not a factor for our consideration. The issue before this Court is whether the district court abused its discretion in denying Helms the ability to become parole eligible.