# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 34667

STATE OF IDAHO,

      Plaintiff-Respondent,

v.

BRIAN L. DRAPER,

      Defendant-Appellant.

Boise, April 2011 Term

2011 Opinion No. 98

Filed: September 13, 2011

Stephen Kenyon, Clerk

Appeal from the District Court of the Sixth Judicial District of the State of Idaho, Bannock County. Hon. Peter D. McDermott, District Judge.

The judgment of conviction and sentence entered upon the jury's verdict for first degree murder is <u>affirmed</u>. The conviction for conspiracy to commit first degree murder is <u>vacated</u> and the case is <u>remanded</u> for a new trial on that charge.

Molly Huskey, State Appellate Public Defender, Boise, for appellant.

Hon. Lawrence G. Wasden, Attorney General, Boise, for respondent. John McKinney argued.

---

HORTON, Justice

Cassie Jo Stoddart (Stoddart) was murdered during the night of September 22nd to 23rd, 2006. Brian Draper (Draper), who was sixteen years-old at the time of Stoddart's murder, and Torey Adamcik (Adamcik), who was also a juvenile, were arrested and charged with murder and conspiracy to commit murder, tried as adults, and convicted during separate trials. Draper was sentenced to a term of fixed life imprisonment for the murder charge and a life sentence with thirty years fixed for the conspiracy charge. Draper now appeals, raising seven issues. He argues that a) the jury instructions for both murder and conspiracy relieved the State of proving all elements of the crimes and violated his right to due process of law; b) Draper's fourth police interview should have been suppressed as his parents were not present at the interview; c) the jury instructions and the district court's failure to suppress the interview, even if individually harmless, cumulatively constitute reversible error; d) the sentences should be vacated because the investigator's presentence report was biased; e) Draper's fixed life sentence for murder

violated the Idaho and U.S. Constitutions' prohibition of cruel and unusual punishment; f) the district court's sentences constituted an abuse of discretion; and g) the district court's denial of Draper's motion under Idaho Criminal Rule 35 to modify his sentences constituted an abuse of discretion. We affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

**A.     Events Surrounding Stoddart's Murder**

Around August 31, 2006, eighteen-year-old Joe Lucero received a call from Torey Adamcik asking if he would buy some knives for him. Together Adamcik and Lucero went with Draper to a local pawn shop to buy the knives. On the way, they stopped at an ATM so that Draper could withdraw money and, of the $45 paid for the knives, Draper provided $40. Adamcik pointed out one knife and Draper selected three others.

Draper and Adamcik had also begun videotaping snippets of themselves talking about killing. This videotape was later recovered with other evidence used in the murder and, at trial, Draper's counsel argued that this tape was part of a horror movie that Draper and Adamcik were making. Portions of the transcript from the video include the following, from the night before Stoddart's murder:

1.  September 21, 2006 at 8:05:23 PM  *Adamcik and Draper are in car, Adamcik is driving and Draper is filming from the passenger seat*
    **Draper:** We're going for a high death count
    **Adamcik**: Plus, we're not going not to get caught Bryan, if we're going for guns, we're just gonna end it. We're just gonna grab the guns and get outta there and kill everybody and leave.
    **Draper**: We're going to make history. . . . We're gonna make history.
    **Adamcik**: For all you FBI agents watching this—
    **Draper**: *laughing*
    **Adamcik**: Uh . . . you weren't quick enough. *laughing*
    **Draper**: You weren't quick enough, and you weren't s-s-smart enough. And we're going over to [Jane Doe 1's] house, we-we-we're going to snoop around over there and try to see if she's home alone or not, and if she's home alone, SPLAT! . . . She dead.
    **Adamcik**: Don't put your humor into this Bryan.
    **Draper**: Uh, I'm not putting any humor into it. . . . Yep, people will die, and m-m-memories will fade.
    **Adamcik**: Memories will fade. . . . Hmm, I wonder what movie you got that from Bryan?
    **Draper**: My self!
    **Adamcik**: *laughing*
    **Draper**: That was from myself.
    **Adamcik**: No wonder it was so lame.
    **Draper**: —kay, we're on our way, and I'm gonna, I'll let you stay tuned, we're almost there.

2. <u>September 21, 2006 at 8:08:12 PM</u>  *Adamcik and Draper sitting in car, Draper is filming Adamcik with the camera light on*

   **Draper**:  We're at [Jane Doe 1's] house. It's clear out there in the pasture.  We've already snooped around her house a couple times, Uh, and sh-sh-she's not at home so we're gonna go to that church over there and we're gonna call a girl and a guy named Cassie and Matt [Beckham, Cassie's boyfriend].  They're our-our friends but we have to make sacrifices.  So um I feel tonight i-i-it is the night and I feel really weird… and stuff.  I feel like I want to kill somebody.  Uh, I know that's not normal but what the hell.

   **Adamcik**:  I feel we need to break away from normal life.

   **Draper**:  How bright is this light? *Draper has turned camera light directly onto Adamcik*

   **Adamcik**:  Because . . . let's put it this way . . . parents, along with their parents, along with their parents, and so on—

   **Draper**:  Uh-huh

   **Adamcik**:  —taught them about God, Jesus, the whole bullshit—

   **Draper**:  *laughing*

   **Adamcik**:  —line.  I'm sure you guys believe in God as well.  I realized when I was in seventh grade . . . along, you don't believe in Santa Claus or—

   **Draper**:  *laughing*

   **Adamcik**:  —vampires, or werewolves, they're used to metaphor, not let — they teach their kids back in the 1800s, I learned this in English class, about telling their kids that they can't go outside or a vampire will get you — just to make their kids stay and do what they want to do.  God is basically—

   **Draper**:  That's what God's for right?

   **Adamcik**:  —the same way—

   **Draper**:  Yep.

   **Adamcik**:  —tryin' to get people to do good, or else "so-called" *air quoting* you go to hell.

   **Draper**:  And we're obviously going to hell if it's real, but who gives a shit?

   **Adamcik**:  And why would you say it's real?

   **Draper**:  *talking over Adamcik* Yeah, but it's not real.  It's not real, cuz it's so blatantly obvious that it's not real, but *laughing*

   **Adamcik**:  People believe it because their parents teach them, and so it's so hard for them to let go of it because they've been taught their whole life.

   **Draper**:  Yeah, I know.

   **Adamcik**:  But, fuckin—

   **Draper**:  What?

   **Adamcik**:  —the point I'm makin' is . . . we are also taught that things like killing people and other things is wrong.  The only that it's wrong about is because it's breaking the law and the law is only wrong *mumbling searching for words*—

   **Draper**:  Natural selection, dude.  Natural selection, that's all I've gotta say.

   **Adamcik**:  There should be no law against killing people.  I know it's a wrong thing, but . . .

   **Draper**:  Natural selection—

   **Adamcik**:  —Hell, hell, you restrict somebody from it, they're just gonna want it more.

   **Draper**:  Exactly.  Goodbye camera.

3. <u>September 21, 2006 at 8:15:39 PM</u>  *Adamcik and Draper are in car, Adamcik is driving and Draper is filming from the passenger seat*

   **Draper**:  —home.  My friend's too pussy to go investigate—turn here

**Adamcik**: Too smart—

**Draper**: Why aren't you turning there dude?

**Adamcik**: Cuz it's faster this way

**Draper**: Now we're going to go over to Cassie and Matt's [Beckham's] house. If they're home alone, we're gonna…

**Adamcik**: It's Cassie's house. Matt [Beckham] is there.

**Draper**: Matt [Beckham] is there. Sorry. We're gonna ga- we're gonna knock on the door. We'll see who is there. We'll, we'll see, we'll see-see if their parents are home or not. If they're home alone we will leave our way and then we will come back in about ten minutes. We'll sneak in through the door because chances are they're probably in Cassie's room. S-s-s-so we will sneak in the front door, we'll make a noise outside.

**Adamcik**: And Matt [Beckham] will come out to investigate.

**Draper**: We'll kill him. And we'll scare the shit out of Cassie . . . okay?

**Adamcik**: Sounds like fun.

**Draper**: Well stay tuned.

4. September 21, 2006 at 8:36:46 PM  *Adamcik and Draper are in car, Adamcik is driving and Draper is filming from the passenger seat*

**Draper**: We found our victim and sad as it may be she's our friend but you know what? We all have to make sacrifices. Our first victim is going to be Cassie Stoddart and her friends . . .

**Adamcik**: *directed at passing car* God, turn your brights off asshole!

**Draper**: We'll let you . . . *laughs* we'll find out if she has friends over, if she's going to be alone in a big dark house out in the middle of nowhere *laughs*. How perfect can you get? I, I mean like holy shit dude.

**Adamcik**: I'm horny just thinking about it.

**Draper**: Hell yeah. So we're gonna fuckin' kill her and her friends and we're gonna keep moving on. I heard some news about [Jane Doe 2], she's gonna be home alone from six to seven so we might kill her and drive over to Cassie's thing and scare the shit out of them and kill them one by fucking one. Hell yeah.

**Adamcik**: Why one by one? Why can't it be a slaughterhouse?

**Draper**: Two by two and three by three. Cause we've got to keep it classy.

**Adamcik**: Keep it classy.

**Draper**: So yeah. It's going to be extra fun.

**Adamcik**: You're evil *laughs*.

**Draper**: Yes, I am. So are you dude. Evil. Evil.

**Adamcik**: No. Evil is an expression of God. That was another test you failed.

**Draper**: Evil is not an expression of God.

**Adamcik**: Yes, it is.

**Draper**: That is bullshit and you know it.

**Adamcik**: Evil of origin is a follower of fucking Satan.

**Draper**: There is no Satan.

**Adamcik**: Is Satan real? Then shut up.

**Draper**: Then how are we supposed to express ourselves?

**Adamcik**: Good and Bad.

**Draper**: We're, we're bad.

**Adamcik**: We are bad.

**Draper**: That sounds so shitty.

**Adamcik**: We're evil. That sounds even shittier.

**Draper**: Hey, we're not, okay. Then we are sick psychopaths who get their pleasure off killing other people.

**Adamcik**: That sounds good baby.

**Draper**: We're gonna go down in history. We're gonna be just like Scream except real life terms.

**Adamcik**: That sounds good baby.

**Draper**: We're gonna be murderers. Like, let's see, Ted Bundy, like the Hillside Strangler.

**Adamcik**: No.

**Draper**: The Zodiac Killer.

**Adamcik**: Those people were more amateurs compared to what we are going to be, we're gonna be more of higher sources of Ed gl . . .

**Draper**: Gein

**Adamcik**: Gein

**Draper**: *laughs* Well let's say we're that sick and that twisted—

**Adamcik**: Oh, you know what Ed Gein's words were?

**Draper**: What?

**Adamcik**: He saw a girl walkin' down the street, right?

**Draper**: Yeah.

**Adamcik**: Two questions came to his head. Hmm, I could take her out and have a nice time with her—

**Draper**: —and then kill her? Skin her alive?

**Adamcik**: —charm the pants off her. Or, I wonder what her head would look like on a stick? *laughs*

**Draper**: *laughs* Holy shit!

**Adamcik**: It's creepy huh?

**Draper**: Kick ass.

**Adamcik & Draper**: *laughing*

**Draper**: Murder is power, murder is freedom, goodbye.

**Adamcik**: Umm—

The following day, Friday, September 22, Draper and Adamcik again videotaped themselves. The tape includes two segments from that day, the first of which is from the early morning.

5. <u>September 22, 2006 at 08:28:11 AM</u> *Draper walking down school hallway. Draper is talking to someone who appears to be walking with him. He then walks by lockers where Cassie is at her locker.*
   **Draper**: Hey look, it's Cassie. Hello Cassie.
   **Cassie**: Hello.
   **Draper**: *laughs* I'm getting you on tape. Okay. Say "hi" please.
   **Cassie**: Hi.

The second segment appears to have been recorded around noon of the same day.

6. <u>September 22, 2006 at 12:10:58 PM</u> *Adamcik and Draper sitting at a table with the camera facing them*
   **Draper**: Alright, cool.

**Adamcik**: *looking down and writing in notebook* I was planning to kill him.

**Draper**: September 22, 2006, we're skipping our fourth hour class. We're writing our plan right now for tonight. It's gonna be cool.

**Adamcik**: We? Torey and Bryan . . . *writing* . . . we're making our death list right now, for when, for actually tonight . . .

**Draper**: *whispering* she's watching us . . .

**Adamcik**: *unintelligible*

**Draper**: She's still watching us . . .

**Adamcik**: *mumbling, unintelligible*

**Draper**: *loudly* Number 2 is what?

*long gap where Adamcik and Draper are both concerned a teacher is going to see them, are whispering various things related to this and trying to make themselves less visible*

**Adamcik**: *writing again* Then . . . *unintelligible*

**Draper**: Yeah, if you're watching this we're probably deceased

. . .

**Draper**: Hopefully this will go smoothly and we can get our first kill done and then keep going.

**Adamcik**: For you future serial killers watching this tape

**Adamcik & Draper**: *laughing*

**Adamcik**: I don't know what to say.

**Draper**: It-It's—

**Adamcik**: —good luck with that.

**Draper**: Good luck.

**Adamcik**: Hopefully you don't have like 8, or 9 failures like we have.

**Draper**: Yeah, we've probably tried maybe 10 times, but they've never been home alone so-

**Adamcik**: Or when they have, their parents show up.

**Draper**: As long as you're patient you know, and we were patient and now we're getting paid off, cuz our victim's home alone, so we got er, our plan all worked out now. . . . I'm sorry. I'm sorry Cassie's family, but she had to be the one. We have to stick with the plan . . . and she's perfect, so she's gonna die *laughs*

A partially burned note was later recovered that may have been the note written at this time. At trial, one of the detectives testified that he believed this note to have been written by Adamcik. The portion of the note that was not burned reads:

> is home alone stop
> out the house
> runs into Torey
> We murder Cassie
> e is home alone
> ouse. . . . Brian chases her th
> her (unclear) + (unclear) . . . kill her.
> c. If Cassie + Matt come ho
> A noise (unclear) . . . kill Matt + (unclear)

On September 22, 2006, Stoddart was spending the night at her cousin's house, the Whispering Cliffs residence, as part of her house-sitting duties. Beckham stated that he and

Stoddart had invited Adamcik to the Whispering Cliffs residence that evening to "hang out." Adamcik and Draper arrived at the Whispering Cliffs residence at approximately 6:30 or 7:00 pm. After spending approximately two hours at the Whispering Cliffs residence, Draper informed Stoddart and Beckham that he needed to leave and shortly thereafter Draper and Adamcik departed.

A further section of the videotape appears to have been recorded at this time:

7. September 22, 2006 at 9:53:20 PM *It is dark and Draper and Adamcik are sitting in a car.*
**Draper**: We're here in his car. The time is 9:50, September 22nd, 2006. Um . . . unfortunately we have the grueling task of killing our two friends and they are right in - in that house just down the street.
**Adamcik**: We just talked to them. We were there for an hour, but…
**Draper**: We checked out the whole house. We know there's lots of doors. There, there's lots of places to hide. Um, I unlocked the back doors. It's all unlocked. Now we just got to wait and um . . . yep, we're, we're really nervous right now but, you know, we're ready.
**Adamcik**: We're listening to the greatest rock band ever.
**Draper**: We've waited for this for a long time.
**Adamcik**: Pink Floyd. Before we commit the ultimate crime of murder.
**Draper**: We've waited for this for a long time.
**Adamcik**: A long time.
**Draper**: We—well stay tuned.

Approximately fifteen minutes after Adamcik and Draper departed, the power at the Whispering Cliffs residence went out; at that time Beckham called his mother to ask for permission to stay the night, however permission was denied. At some point after Beckham left, Stoddart was stabbed to death. The autopsy revealed that she had been stabbed approximately thirty times and twelve of the wounds were considered "potentially fatal." A second examination of the body concluded that two different knives had been used. One knife, with a serrated blade, had inflicted eleven of the twelve potentially fatal wounds. A second, single-bladed and non-serrated knife inflicted one potentially fatal wound and other non-fatal wounds.

A portion of the videotape appears to have been recorded just after the murder.

8. September 22, 2006 at 11:31:56 PM *Adamcik and Draper are in a car driving.*
**Draper**: —just killed Cassie! We just left her house. This is not a fucking joke.
**Adamcik**: I'm shaking.
**Draper**: I stabbed her in the throat, and I saw her lifeless body. It just disappeared. Dude, I just killed Cassie!
**Adamcik**: Oh my God!
**Draper**: Oh, oh fuck. That felt like it wasn't even real. I mean it went by so fast.
**Adamcik**: Shut the fuck up. We gotta get our act straight.
**Draper**: It's okay. Okay? We- we'll just buy movie tickets now.
**Adamcik**: Okay

**Draper**: *Unintelligible*
**Adamcik**: No.
**Draper**: Okay. Bye.

Stoddart's body was discovered by the owners of the Whispering Cliffs residence when they returned on Sunday, September 24. They called the police who began their investigation.

## B.    The Police Investigation

Police officers contacted Draper and Adamcik that evening after speaking with Beckham. Draper's first interview was not recorded and Draper was not in custody at that point. Draper said that he and Adamcik had gone to see a movie and, while it was too late to see the movie they had originally intended to see they went to a different movie, *Pulse*. When asked about the movie, Draper was unable to explain the plot. Draper wrote out a description of what he said occurred during that evening.

On Tuesday evening, September 26, 2006, the officers conducted Draper's second interview. Draper's parents were present but did not go into the interview. Draper was read his *Miranda* rights before the interview began. Draper initially maintained that he and Adamcik had gone to the movie but, after one of the officers told him that he did not believe that he had gone to the movies, Draper said that he and Adamcik had "gone through" cars and had said they went to a movie to hide that. When he was told that his car burglary story was not convincing, Draper insisted that it was the truth. After the interview, Draper left with his parents.

After the second interview, a detective went to the Draper residence and, with the consent of Draper and his parents, searched Draper's bedroom for gloves and other items related to Stoddart's murder. The detectives found a knife sheath which Draper said belonged to a friend and that he did not know where the knife was but that he thought his friend had it.

Draper's third interview occurred on Wednesday, September 27, 2006. Draper was again advised of his *Miranda* rights and again consented to speak. Draper's parents were present for this interview. At this interview, Draper admitted that he and Adamcik unlocked a door at the Whispering Cliffs residence so that they could return to scare Stoddart and Beckham. He also stated that they wore masks, black clothing, and gloves and carried knives with them. Draper stated that after Beckham left, they went upstairs and Adamcik stabbed Stoddart. Draper said that he thought that it was a joke to scare him and only later realized that Stoddart was actually being stabbed. Draper denied that he had ever touched or stabbed Stoddart. Draper also stated that he had talked to Adamcik earlier that day and that Adamcik had threatened to kill him if he

told the authorities the truth. Draper also agreed to show the officers where he and Adamcik had attempted to dispose of items used in Stoddart's murder.

Draper went with several detectives and his father to the Black Rock Canyon area and directed the detectives to a site where evidence from the murder was buried. The evidence located included:

- o Stick matches.
- o A pair of black boots.
- o A pair of blue rubber gloves.
- o A pair of Athletics Works brand fingerless gloves.
- o A melted brown hydrogen peroxide bottle.
- o A multi-colored mask.
- o A large dagger-type knife with a sheath.
- o A silver and black-handled knife with a signature of "Sloan" written on the inside.
- o A small dagger-type knife with a sheath.
- o A Sony videotape. This is the videotape that was later repaired and straightened in order to make it playable and transcribed as above.
- o A black-handled serrated folding knife. Later DNA testing revealed that Stoddart's blood was present on this knife.
- o A partly burned piece of paper with writing in pencil. This is the note transcribed above.
- o A red and white mask. Later DNA testing revealed a partial DNA profile of Adamcik on the mask.
- o A single black glove. Later DNA testing revealed a partial DNA profile from an unknown male.
- o A pair of partially burned black Puma brand gloves. Later DNA testing revealed that Stoddart's blood had soaked into these gloves.
- o A blue plastic garbage bag.
- o A partially burned black long-sleeved Haggar brand dress shirt.
- o A Calvin Klein black dress shirt. Later DNA testing revealed that Stoddart's blood was present on the shirt cuff.
- o A white and grey sock.
- o A small piece of black cord.

At this point Draper was arrested and spent the night of September 27-28 in the Bannock County jail. Shortly after noon on Thursday, September 28, Draper was interviewed for a fourth time. Although the police attempted to contact Draper's parents they were unable to do so. Draper, after again being given his *Miranda* rights and being told that he could have his parents present, agreed to go ahead with the interview. Draper initially repeated that Adamcik was the only person who stabbed Stoddart. After one of the officers asked whether Draper stabbed Stoddart to keep Adamcik from turning on him, Draper nodded. Draper then admitted to stabbing Stoddart four times in the leg and chest. Draper said that Adamcik had told him "you need to stab her, you need to stab her." After stabbing Stoddart in the leg, Draper stated that

Adamcik told him "it's not going to work, she has to die." Shortly after, at about thirteen minutes into the interview, Draper asked if he could see his parents and the officers ended the interview.

## C.     Draper's Trial

Draper and Adamcik were each charged with one count of murder in the first degree and one count of conspiracy to commit murder in the first degree. They each moved to sever the trials and the district court granted the motions. Draper also filed a motion to suppress his fourth interview, arguing that, because his parents were not present, he had not voluntarily consented to the interview. The district court denied this motion, finding that, in light of the totality of the circumstances, Draper voluntarily waived his right to remain silent and that his parents had not unequivocally invoked Draper's right to counsel.

After trial by jury, Draper was convicted of first-degree murder and conspiracy to commit murder in the first degree. The jury instructions mirrored the Idaho Criminal Jury Instructions and did not include an instruction on aiding and abetting, nor did they include a definition of willfulness. Draper's motion for a new trial was denied by the district court.

## D.     Draper's Sentencing and Appeal

Following the jury's verdict, the district court ordered a presentence investigation (PSI), including a psychological evaluation. The district court's order allowed Draper's parents to sit in on the investigator's presentence interview with Draper. The investigator then wrote to the district court, asking that Draper's parents not be allowed to sit in on the interview, stating:

> I question whether [Draper] can be totally honest regarding relationships (to include sexual relationships) or even substance abuse issues with a family member present. As the Court is aware, any areas of deception could reflect poorly on Mr. Draper if the truth should come out. I am also concerned the parents, in an effort to protect their son or themselves, will interfere with my interview if they do not like the direct questions regarding the crime or issues related to any abuse or neglect.

As a result, the district court ruled that Draper's parents could not attend his presentence interview.

Before sentencing, Draper objected to the contents of the PSI, arguing that the investigator was biased and that the PSI did not conform to the dictates of Idaho Criminal Rule 32, which outlines the form and content of presentence investigations. The district court denied this motion, finding that, although not perfect, the PSI complied with Rule 32.

Before pronouncing sentence, the district judge discussed the brutal nature of the crime and stated that he was convinced that if Draper "were released, that you would kill again. I'm convinced of that beyond a reasonable doubt." Based on these conclusions, the district court sentenced Draper to a fixed life sentence for his first degree murder conviction and an indeterminate life sentence, with thirty years fixed, for conspiracy to commit first degree murder.

Draper filed a motion under I.C.R. 35 for correction of his sentence. The motion included submissions from Draper's parents, from Draper, and from the Department of Correction, detailing his attempts to rehabilitate himself. The district court viewed this as a motion for leniency under I.C.R. 35 and found that the submissions did not change the court's initial view that the sentences imposed were reasonable.

Draper timely appealed.

## II. ANALYSIS

### A.  Jury Instructions

Draper makes two arguments that the jury instructions in his case constituted reversible error. He argues that the failure to define "willfulness" in the murder instruction was error, as was the inclusion of "purpose" as one of the overt acts in the elements of conspiracy. He notes that counsel failed to raise these objections at trial but argues that the claimed errors in the jury instructions constitute fundamental error.

#### 1.  Standard of Review

"Whether jury instructions fairly and adequately present the issues and state the applicable law is a question of law over which this Court exercises free review." *State v. Humpherys*, 134 Idaho 657, 659, 8 P.3d 652, 654 (2000). Therefore, the correctness of a jury instruction depends on whether there is evidence at trial to support the instruction. *Craig Johnson Constr., L.L.C. v. Floyd Town Architects*, *P.A.*, 142 Idaho 797, 800, 134 P.3d 648, 651 (2006). We look at the jury instructions as a whole, not individually, to determine whether the jury was properly and adequately instructed. *Obendorf v. Terra Hug Spray Co.*, 145 Idaho 892, 896, 188 P.3d 834, 838 (2008). An erroneous instruction will not constitute reversible error unless the instructions as a whole misled the jury or prejudiced a party. *Kuhn v. Proctor*, 141 Idaho 459, 462, 111 P.3d 144, 147 (2005).

*State v. Shackelford*, 150 Idaho 355, ___, 247 P.3d 582, 600-01 (2010).

An error generally is not reviewable if raised for the first time on appeal. *State v. Sheahan*, 139 Idaho 267, 277, 77 P.3d 956, 966 (2003). Moreover, Idaho Criminal Rule 30(b) provides that "[n]o party may assign as error the giving of or failure to give an instruction unless the party objects thereto before the jury retires

- 11 -

to consider its verdict, stating distinctly the instruction to which the party objects and the grounds of the objection."

However, this Court traditionally has reviewed "fundamental" errors on appeal, even when no objection was raised at trial. *State v. Haggard*, 94 Idaho 249, 486 P.2d 260 (1971). An error is fundamental when it "so profoundly distorts the trial that it produces manifest injustice and deprives the accused of his fundamental right to due process." *State v. Lavy*, 121 Idaho 842, 844, 828 P.2d 871, 873 (1992).

*State v. Anderson*, 144 Idaho 743, 748, 170 P.3d 886, 891 (2007).

2.    Fundamental Error

For both the murder and conspiracy instructions, the State argues that because Draper did not object to the instructions at trial (indeed, with regard to the murder instruction, Draper's counsel did not submit a definition of willfulness in his proposed jury instructions), these assignments of error are not reviewable for the first time on appeal.

With regard to the murder instruction, the State argues that because Draper has failed to allege any actual error, Draper's argument cannot rise to the level of fundamental error. Similarly, with regard to the instruction for conspiracy, the State argues that the jury could have only understood the instruction correctly. These arguments avoid the issue. Draper's argument is that the jury instructions relieved the State of its duty to prove all elements of the charges beyond a reasonable doubt. If these arguments are correct, Draper has been denied his right to due process and those errors would rise to the level of fundamental error. "The United States Supreme Court has held that in criminal trials 'the State must prove every element of the offense, and a jury instruction violates due process if it fails to give effect to that requirement.'" *Anderson*, 144 Idaho at 749, 170 P.3d at 892 (quoting *Middleton v. McNeil*, 541 U.S. 433, 437 (2004)). Here, if the instruction omitted a contested element of the crime, it would have violated Draper's due process rights and would consequently rise to the level of fundamental error.

3.    Murder Jury Instruction

Draper argues that the jury instructions for murder were misleading. He points to the language in Instruction 13 which states:

In order for the Defendant to be guilty of First Degree Murder, the State must prove that the murder:

. . . .

was willful, deliberate, and premeditated killing. [sic] Premeditation means to consider beforehand whether to kill or not to kill, and then to decide to

- 12 -

kill. There does not have to be any appreciable period of time during which the decision to kill was considered, as long as it was reflected upon before the decision was made. A mere unconsidered and rash impulse, even though it includes an intent to kill, is not premeditation.

Draper argues that by failing to define willfulness, the court relieved the State of its burden of proving one of the elements of the crime beyond a reasonable doubt. Draper cites *State v. Aragon*, 107 Idaho 358, 363, 690 P.2d 293, 298 (1984), for the proposition that "[m]alice, the intent to act feloniously, [is] properly distinguished from willfulness, the intent to take life . . . ." He also notes that willfulness has a variety of legal meanings, including, in the context of contempt, "'an indifferent disregard of duty' or 'a remissness and failure in performance of a duty' but not a 'deliberately and maliciously planned dereliction of duty.'" *In re Weick*, 142 Idaho 275, 281, 127 P.3d 178, 184 (2005). Because of these different meanings, including meanings that do not include a specific intent requirement, he argues that the failure to provide a definition of willfulness relieved the State of proving every element of first-degree murder beyond a reasonable doubt. Draper also points to the statutory requirement that there must have been "a union, or joint operation, of act and intent . . . ." I.C. § 18-114. He argues that a reasonable jury could have found that Draper's intent to kill, as included in the definition of premeditation,[1] was not present when he stabbed Stoddart as, he argues, he only stabbed her after Adamcik stabbed her and he did so only at Adamcik's direction.

We reject these arguments. First, because the premeditation is only referable to Stoddart's murder (i.e. not some intent to kill that was not manifested), the jury evidently found an intent to commit the murder Draper was charged with. Second, "[t]erms which are of common usage and are sufficiently generally understood need not be further defined when instructing the jury." *State v. Zichko*, 129 Idaho 259, 264, 923 P.2d 966, 971 (1996) (citing *State v. Gonzales*, 92 Idaho 152, 156, 438 P.2d 897, 901 (1968)). The jury was instructed that, in order to issue a guilty verdict on the first degree murder charge, the murder had to be a "willful, deliberate, *and* premeditated killing." Both willful and deliberate are included. The common understandings of willful and deliberate include an intention to commit the particular act. *See, e.g., Merriam-Webster Collegiate Dictionary* 1433 (11th ed. 2003) ("Willful . . . 2: done

---

[1] The jury instructions defined premeditation as whether Draper "consider[ed] beforehand whether to kill or not to kill, and then . . . decide[d] to kill."

deliberately: Intentional.").[2] As such, it did not constitute reversible error to omit that definition. When compared with the situation in *Aragon*, the difference is evident. There, the distinction was between malice and willfulness and, unlike malice, which has a specific legal definition, the common definition of willfulness is applicable. Here, Draper is attempting to insert legal definitions where the common definition is the appropriate one. Third, as noted above, Draper failed to request any definition of willfulness. His requested jury instructions included a definition of premeditation and omitted any definition of willfulness, as did the instructions given to the jury. "Appellant cannot assert as error on appeal the giving of an instruction which he himself requested." *Aragon*, 107 Idaho at 363, 690 P.2d at 298 (citing *Henry v. Mississippi*, 379 U.S. 443 (1965); *Daellenbach v. State*, 562 P.2d 679 (Wyo. 1977)).

We find that the jury was instructed to and did find that Draper decided to kill Stoddart, had the actual intent to kill her, and did, in fact, kill Stoddart.

4.      Conspiracy Jury Instruction

Draper's jury instructions for conspiracy, as read to the jury and as included in the record as the original instructions, changed the seventh element of the instruction to be a fifth "overt act." The instruction stated:

> In order for the defendant to be guilty of Conspiracy, the State must prove each of the following:
>
> 1.      On or between the 22nd and 23rd days of September, 2006
>
> 2.      in the state of Idaho
>
> 3.      the defendant BRIAN LEE DRAPER and TOREY MICHAEL ADAMCIK agreed
>
> 4.      to commit the crime of MURDER IN THE FIRST DEGREE
>
> 5.      the defendant intended that the crime would be committed;
>
> 6.      one of the parties to the agreement performed at least one of the following acts:
>
> 1.      On or about the 29th and/or 30th days of August, 2006, BRIAN LEE DRAPER, did purchase and/or receive knives that were used in the commission of the murder of Cassie Stoddart.
>
> 2.      On or about the 21st and/or 22nd days of September, 2006, BRIAN LEE DRAPER, did travel to the residence located at 11372 Whispering

---

[2] Draper's argument that the jury could have read "willful" as having required only an intention to stab as opposed to an intention to kill is undercut by the fact that the jury instruction reads that it must have been a "willful, deliberate, and premeditated *killing*."

Cliffs, Pocatello, Bannock County, Idaho, with Torey Michael Adamcik to commit the murder of Cassie Stoddart.

        3.     On or about the 22nd and/or 23rd days of September, 2006, BRIAN LEE DRAPER did retrieve from a vehicle a change of clothes, mask, and murder weapons which were used in the commission of the murder of Cassie Stoddart.

        4.     On or about the 22nd and/or 23rd days of September, 2006, BRIAN LEE DRAPER did lie in wait in the downstairs portion of the residence located at 11372 Whispering Cliffs, Pocatello, Bannock County, Idaho, in preparation of committing the murder of Cassie Stoddart.

        5. [3]     such act was done for the purpose of carrying out the agreement.

If each of the above has been proven beyond a reasonable doubt, you must find the defendant guilty. If any of the above has not been proven beyond a reasonable doubt, then you must find the defendant not guilty.

In reviewing jury instructions, the Court has noted that an "instruction complained of must be read and construed with the other instructions given." *Bushong v. Kamiah Grain Inc.*, 96 Idaho 659, 661, 534 P.2d 1099, 1101 (1975). Likewise,

"[w]here the jury instructions, taken as a whole, correctly state the law and are not inconsistent, but may be reasonably and fairly harmonized, it will be assumed that the jury gave due consideration to the whole charge contained in all the instructions and was not mislead by any isolated portion thereof."

*State v. Enno*, 119 Idaho 392, 405, 807 P.2d 610, 623 (1991).

The State is correct that the "done for the purpose" instruction does not constitute an act. However, it is impossible to say whether a reasonable jury would have determined that it was required to find beyond a reasonable doubt that one of the four preceding overt acts was committed for the purpose of furthering the agreement to commit first degree murder. When the instruction states that "one of the parties to the agreement performed at least one of the following acts" and then presents a list, the obvious message was that the jury was only required to find one item on the list to be true beyond a reasonable doubt in order to convict Draper of conspiracy. The failure to clearly require the jury to find that an overt act was committed for the purpose of advancing the conspiracy relieved the State of its burden of proving every element of the crime beyond a reasonable doubt.

A jury need not consider instructions that are mere surplusage. *State v. Pratt*, 125 Idaho 546, 559-60, 873 P.2d 800, 813-14 (1993). If the jurors found one of the first four items on the

---

[3] This was hand-renumbered from seven to five. The court reporter's transcript formats the instruction as the fifth in the list of five "overt acts."

list to be true, i.e., that Draper purchased knives, traveled to the Whispering Cliffs residence to commit murder, retrieved clothing, a mask and murder weapons from the vehicle, or lay in wait downstairs in preparation for the murder, they may have viewed the "for the purpose of" language as surplusage, thus eliminating the requirement that the State prove one element of the crime. For example, the jury could easily have found that Draper purchased and/or received the knives used in Stoddart's murder, but stopped there without considering whether this was for the purpose of furthering the agreement with Adamcik to murder Stoddart.

Nor can we say with any certainty that instruction 17-A, stating that Draper "is not guilty of Conspiracy if the defendant in good faith withdrew by informing another party to the conspiracy of the defendant's withdrawal before any party performed an act for the purpose of carrying out the agreement," necessarily conveyed to the jurors that they were required to find that the overt act was done to further the conspiracy. A reasonable juror might have viewed 17-A as a defense, separate and distinct from the elements of the conspiracy charge. Draper did not highlight withdrawal as a defense to the conspiracy charge. Under these circumstances, we cannot conclude that a reasonable jury would have understood that the withdrawal instruction required them to find the "for the purpose of" element to be true beyond a reasonable doubt in order to convict Draper of conspiracy.

Three other considerations bear note here. First, there is the fact that the jury instructions were renumbered by hand. When a hand-written correction exists, the logical inference is that it was, in fact, a correction. That is, the prior version was incorrect and the revision was intended to correct the error. That indicates that the "for the purpose" language was merely one of the available options within the list of overt acts and that the jury only needed to find one of them to be true in order to convict. To conclude otherwise, one would have to assume that the jury knew the law better than the judge *and* that it ignored the instruction that states "[i]f anyone states a rule of law different from any I tell you, it is my instruction that you must follow." Second, there is the fact that the jury never asked the judge about the meaning of the conspiracy charge.[4] This indicates that the jury was not confused about their instruction (although it does not indicate *how* they construed the conspiracy instruction). Finally, the State, in its closing arguments reviewed the jury instructions and did not make any reference to the requirement that the overt act be

---

[4] Indeed, the record does not reflect that the jury sent any questions to the trial court about the jury instructions.

undertaken for the purpose of furthering the agreement to kill Stoddart.  In short, there is nothing to indicate how the jury viewed those instructions.

There is undoubtedly some disconnect between the "one of the following" instruction and the inclusion of the "for the purpose of" instruction in that element of conspiracy.  While the argument advanced by the State is not unreasonable, it is impossible to say that a reasonable jury *could not* have read the instruction to omit the required element that an overt act occurred in the furtherance of the conspiracy.  *Garcia v. Windley*, 144 Idaho 539, 543, 164 P.3d 819, 823 (2007) ("An erroneous instruction is prejudicial when it could have affected or did affect the outcome of the trial.").

The State further argues that if the conspiracy instruction was erroneous, such error was harmless.

> [W]here the jury instructions were only partially erroneous, such as where the jury instructions improperly omitted one element of a charged offense, the appellate court may apply the harmless error test, and where the evidence supporting a finding on the omitted element is overwhelming and uncontroverted, so that no rational jury could have found that the state failed to prove that element, the constitutional violation may be deemed harmless.

*State v. Perry*, 150 Idaho 209, __, 245 P.3d 961, 976 (2010).

This statement in *Perry* was based, in part, upon the United States Supreme Court's decision in *Neder v. U.S.*, 527 U.S. 1 (1999).  In *Neder*, the Court stated:  "Unlike such defects as the complete deprivation of counsel or trial before a biased judge, an instruction that omits an element of the offense does not *necessarily* render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence."  *Id*. at 9 (emphasis original).  The Court concluded that "where a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless."  *Id*. at 17.

We are unable to conclude that the error was harmless because the defense vigorously contested the omitted element, asserting that Draper's conduct, including the four overt acts charged in the information, was not intended to further a conspiracy to commit first degree murder.  Indeed, Draper's defense to the conspiracy charge was that his actions were intended as

a joke to scare Stoddart, but that Adamcik then surprised him by attacking Stoddart.[5]  As this case does not satisfy the requirement pronounced in *Neder* – that "the omitted element was uncontested" – we are unable to find the instructional error to be harmless.  For that reason, we vacate the judgment entered on the conspiracy charge and remand for a new trial.

**B.      Draper's motion to suppress his fourth interview was properly denied.**

    1.      Standard of Review

> In reviewing a district court order granting or denying a motion to suppress evidence, the standard of review is bifurcated.  *State v. Watts*, 142 Idaho 230, 232, 127 P.3d 133, 135 (2005).  This Court will accept the trial court's findings of fact unless they are clearly erroneous.  *State v. Diaz*, 144 Idaho 300, 302, 160 P.3d 739, 741 (2007).  However, this Court freely reviews the trial court's application of constitutional principles in light of the facts found.  *Id.*

*State v. Frederick*, 149 Idaho 509, 512, 236 P.3d 1269, 1272 (2010).  "A district court's conclusion that a defendant made a knowing and voluntary waiver of his *Miranda* rights will only be disturbed on appeal if the conclusion is not supported by substantial and competent evidence."  *State v. Payne*, 146 Idaho 548, 558, 199 P.3d 123, 133 (2008) (citing *State v. Varie*, 135 Idaho 848, 851, 26 P.3d 31, 34 (2001)).

When examining a juvenile's waiver of his *Miranda* rights, the Court looks to the totality of the circumstances.

> The totality approach permits—indeed, it mandates—inquiry into all the circumstances surrounding the interrogation. This includes evaluation of the juvenile's age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights.

*Fare v. Michael C.*, 442 U.S. 707, 725 (1979).

    2.      The District Court's Determination

Draper's fourth interview occurred on September 28, 2006.  The day before, during his third interview, Draper had admitted to being present at Stoddart's murder but said that only Adamcik stabbed Stoddart.  Draper then went with several detectives and his father to the Black Rock Canyon area where they located a variety of evidence including the knives, clothing used in the attack, the partially burnt paper that included a number of references to killing including

---

[5] The State introduced recordings of Draper's interviews with law enforcement officers.  This constituted evidentiary support for Draper's defense.

the phrase "Brian kills" and "We murder Cassie," the videotape of Draper and Adamcik, and other evidence admitted at trial. Draper was placed under arrest that evening.

During the fourth interview, Draper stated that, after Adamcik repeatedly stabbed Stoddart, Draper stabbed her as well but only because Adamcik told him to and only reluctantly. Shortly after making this admission, Draper asked for his parents and the interview ended. Before trial, Draper moved to suppress the fourth interview and any further evidence gained as a result of that interview.[6]

In response to Draper's motion to suppress, the district court made a variety of findings of fact:

> 1. Draper was 16 years of age at the time of the fourth interview with law enforcement.
>
> 2. At the time of the fourth interview, Draper had completed his sophomore year of high school and was enrolled as a junior at Pocatello High School.
>
> 3. Draper had no prior experience with law enforcement prior to his first interview with Detectives Danske and Thomas on September 25, 2006.
>
> 4. Draper's parents were present for Draper's first, second, and third interview, but were not present for Draper's fourth interview.
>
> 5. Draper's prior experience with law enforcement includes only his first, second, and third interview, all occurring within the three days prior to the fourth interview. Draper was read his *Miranda* rights and signed a *Miranda* waiver form at the third interview.
>
> 6. Following the third interview, Draper's parents and Sherriff [sic] Nielsen engaged in a conversation regarding legal representation for Draper, but the Drapers did not assert the right to counsel on behalf of their son.
>
> 7. There is no evidence, one way or the other, indicating that Draper was deprived of food or sleep prior to the interview.
>
> 8. It is not the Bannock County Jail's practice to deprive an inmate of food or sleep.
>
> 9. Draper suffers from anxiety and has a dominant ear that affects the way he thinks.
>
> 10. At the time of the fourth interview, Draper was still under arrest from the previous day, and was not free to leave.
>
> 11. The form that the Sherriff's [sic] office uses for juveniles to waive *Miranda* rights does not indicate that the juvenile defendant has a right to have his or her parents present at the interview.

---

[6] Draper does not identify any additional evidence gathered as a result of the fourth interview.

12.     Draper was verbally instructed that he had a right to have his parents present at the fourth interview.

13.     Draper was mirandized before questioning at the fourth interview commenced.

14.     Draper signed a form waiving his *Miranda* rights before the questioning started.

15.     Draper did not invoke his right to have counsel present.

16.     Draper did not appear tired, ineffectual or vulnerable during the interview.

17.     Draper had a noticeable stutter during the fourth interview.

18.     Draper is able to articulately express himself, both in verbal and written form to the extent that is expected of an average 16 year old high school sophomore.

19.     The fourth interview concluded because Draper requested the presence of his parents.

Given these findings, the district court denied Draper's motion to suppress, finding that he had knowingly and voluntarily waived his right to remain silent and right to counsel.

3.     Draper's motion to suppress was properly denied.[7]

Draper does not dispute the district court's findings of fact and we note that all of those findings are supported by substantial and competent evidence. Draper's main argument on appeal concerns the role of promises of assistance made by the police. This Court has stated:

Indications of cooperation are routinely brought to the attention of a sentencing judge and cases before this Court are replete with examples of such statements in the presentence report, which this Court has required to be before a sentencing judge. Nevertheless, even is [sic] such actions were deemed to be promises of leniency, they do not necessarily render a confession involuntary. *People v. York*, 537 P.2d 294 (Colo. 1975); *State v. Riley*, 576 P.2d 1311 (Wash. Ct. App. 1978). *But see People v. Jiminez*, 580 P.2d 672 (Cal. 1978); *State v. Watson*, 487 P.2d 197 (N.M. 1971). Rather, we believe the question of voluntariness must be resolved by examining the totality of the circumstances surrounding the confession. *Brady v. United States*, 397 U.S. 742 (1970); *State v. Powers*, 96

---

[7]     We reach this issue despite the State's argument that the only issue raised below was the question of whether Draper waived his *Miranda* rights and not whether promises to assist Draper made by the police officers coerced Draper into his admission. "The longstanding rule of this Court is that we will not consider issues that are presented for the first time on appeal." *State v. Lovelace*, 140 Idaho 53, 62, 90 P.3d 278, 287 (2003) (citing *State v. Robbins*, 123 Idaho 527, 529, 850 P.2d 176, 178 (1993)). However, as Draper argues, the issue below was not merely whether Draper waived his *Miranda* rights but whether the interview was coerced. As such, it is proper to consider the entirety of the district court's determination that Draper knowingly and voluntarily waived his right to remain silent or his right to counsel.

Idaho 833, 537 P.2d 1369, *cert. denied*, 423 U.S. 1089 . . . (1975); *See also Malloy v. Hogan*, 378 U.S. 1 (1964).

*State v. Alger*, 100 Idaho 675, 679-80, 603 P.2d 1009, 1013-14 (1979). That is, a court focuses on the totality of the circumstances, including the defendant's age and the effect of any promises made. The district court did exactly this. Based upon the record presented to the district court, there is no evidence that the promises of leniency, alone or in conjunction with Draper's age, overwhelmed Draper's ability to refuse to speak with the officers.

As the Court addressed in *State v. Doe*, a court looks to six factors to determine whether a confession was voluntary.

(1) Whether *Miranda* warnings were given;

(2) The youth of the accused;

(3) The accused's level of education or low intelligence;

(4) The length of detention;

(5) The repeated and prolonged nature of the questioning; and

(6) Deprivation of food or sleep.

137 Idaho 519, 523, 50 P.3d 1014, 1018 (2002) (quoting *State v. Troy*, 124 Idaho 211, 214, 858 P.2d 750, 753 (1993)). As indicated by the findings of fact quoted above, these were exactly the issues that the district court considered. "[T]he power to judge the credibility of the witnesses, resolve any conflicts in the testimony, weigh the evidence and draw factual inferences, is vested in the trial court." *State v. Valdez-Molina*, 127 Idaho 102, 106, 897 P.2d 993, 997 (1995) (quoting *State v. Kirkwood*, 111 Idaho 623, 625, 726 P.2d 735, 737 (1986)). We note that Draper never asked for specific findings of fact with regard to the promises of leniency and that the district court apparently placed little weight on the role of the promises of the police. We further note that Draper never offered any evidence that would tend to link the promises of leniency to the incriminating statements that occurred during the fourth interview. Indeed, it appears that most of Draper's statements were motivated by his being confronted with prior inconsistencies and false statements. Based upon these factors and the district court's findings of fact, the district court properly found that the waiver of Draper's *Miranda* rights was not coerced.

We find that Draper made a knowing and voluntary waiver of his *Miranda* rights, that he was not coerced, and that the district court properly denied Draper's motion to suppress.

## C. Cumulative Error

Draper argues that the combination of the jury instructions and the use of the fourth interview at trial, even if individually they do not constitute reversible error, collectively constitute cumulative error that warrants reversal. "[T]he cumulative error doctrine requires reversal of a conviction when there is 'an accumulation of irregularities, each of which by itself might be harmless, but when aggregated, the errors show the absence of a fair trial, in contravention of the defendant's constitutional right to due process.'" *State v. Field*, 144 Idaho 559, 572-73, 165 P.3d 273, 286-87 (2007) (quoting *State v. Moore*, 131 Idaho 814, 823, 965 P.2d 174, 183 (1998)). The cumulative error doctrine is inapplicable to Draper's case. Although there was reversible error in the conspiracy instruction, there was no error affecting the conviction for first degree murder. We therefore find that Draper has not shown that the cumulative error doctrine applies to his case.

## D. Draper's Presentence Report

### 1. The Boundaries of Idaho Criminal Rule 32

Idaho Criminal Rule 32 allows a judge to order a PSI for use in the sentencing phase of a trial. As envisioned by Criminal Rule 32, the PSI "is used to assist the 'court in individualizing a rational sentence for the defendant. Simply put, the compelling need for information about the defendant at sentencing cannot be arbitrarily disregarded.'" *State v. Romero*, 116 Idaho 391, 393-94, 775 P.2d 1233, 1235-36 (1989) (quoting *Idaho Judge's Sentencing Manual* § 5.52). Draper points to two areas of the PSI that, he argues, fail to comply with I.C.R. 32.[8] First, he argues that the investigator was biased, asked improperly probing questions, and presented a biased report. Second, he argues that the exclusion of his parents from the presentence interviews was a violation of his *Miranda* rights.

Rule 32 specifies the following contents of a PSI:

A trial judge may request a record check and other background information concerning the defendant prior to sentence without conducting a full presentence investigation of the defendant. However, whenever a full presentence report is ordered, it shall contain the following elements:

(1) The description of the situation surrounding the criminal activity with which the defendant has been charged, including the defendant's version of the criminal act and the defendant's explanation for the act, the arresting officer's version or

---

[8] Despite the State's argument that this issue was not raised below, Draper's motion and arguments regarding the form and contents of the PSI included the issue of bias and fairly presented the issue to the district court.

report of the offense, where available, and the victim's version, where relevant to the sentencing decision.

(2) Any prior criminal record of the defendant.

(3) The defendant's social history, including family relationships, marital status, age, interests and activities.

(4) The defendant's educational background.

(5) The defendant's employment background, including any military record, and defendant's present employment status and capabilities.

(6) Residence history of the defendant.

(7) Financial status of defendant.

(8) Health of the defendant.

(9) The defendant's sense of values and outlook on life in general.

(10) The presentence investigator's analysis of the defendant's condition. That analysis of the defendant's condition contained in the presentence report should include a complete summary of the presentence investigator's view of the psychological factors surrounding the commission of the crime or regarding the defendant individually which the investigator discovers. Where appropriate, the analysis should also include a specific recommendation regarding a psychological examination and a plan of rehabilitation.

I.C.R. 32(b). The Rule also specifies the role of the investigator, as distinct from those areas that are particularly within the province of the district court.

The presentence report may recommend incarceration but it should not contain specific recommendations concerning the length of incarceration, the imposition of a fine or the amount of a fine, or the length of probation or other matters which are within the province of the court. Provided, however, the presentence report may comment generally on the probability of the defendant's successfully completing the term of probation or the defendant's financial ability to pay a fine imposed by the court.

I.C.R. 32(c).

The court of appeals has stated:

Provided that a defendant is afforded a full opportunity to present favorable evidence and to explain and rebut adverse evidence, and a reasonable opportunity to examine all of the materials contained in the PSI, the defendant and the court can be assured of the reliability and the fairness of the conclusions presented therein.

*State v. Chapman*, 120 Idaho 466, 471, 816 P.2d 1023, 1028 (Ct. App. 1991), *quoted in State v. Dowalo*, 122 Idaho 761, 763, 838 P.2d 890, 892 (Ct. App. 1992).

2.　　The Nature of the Investigation and the Substance of the Report

- 23 -

Draper raises objections to both the form of the investigation process and the substance of the final report. He points to questions such as "I questioned Brian as to why they took real knives," "I questioned Brian about when [Stoddart] was stabbed in the back," "I asked Brian why he did not try to get away while Torey was turning the lights back on if he was afraid of him," and "I questioned Brian about telling the truth because he was facing a polygraph test [on] that date." These and other statements in the PSI, Draper argues, "were pointed questions designed to illicit [sic] further incriminating statements from Brian about the crime and circumstances surrounding the crime."

There are two conflicting principles in assessing whether this questioning violates Criminal Rule 32. The first is the point that Draper focuses on, that investigatory questioning is not an opportunity to present "the defendant's version of the criminal act and the defendant's explanation for the act . . . ." I.C.R. 32(b)(1). The rule also states that "conjecture and speculation should not be included in the presentence report." I.C.R. 32(e)(1). These indicate that the report is to be a neutral document and not an opportunity to simply advocate for the State's position.

However, the primary purpose of a PSI is to assist the district court in sentencing. It includes the "presentence investigator's analysis of the defendant's condition . . . [including] a complete summary of the presentence investigator's view of the psychological factors surrounding the commission of the crime or regarding the defendant individually which the investigator discovers." I.C.R. 32(b)(10). In order to adequately prepare this analysis and to assess the ways in which the defendant is accepting responsibility and cooperating in his or her rehabilitation, an investigator must go beyond simply accepting a narrative from the defendant. Rule 32 does not prohibit questioning the defendant. Viewing the PSI as a whole we find that the questioning in this case did not violate Rule 32.

Draper further argues that the PSI demonstrated the bias of the investigator. This comes much closer to violating the dictates of Rule 32. The PSI concludes that Draper:

> made a choice to take the life of another human being, a choice the victim did not have . . . . This is the type of behavior that we, as a society cannot take a second chance at, because you cannot replace a life as you can a stolen television or broken window.

Although this is followed by the statement that "probation is not a viable option in this matter" the statement that "society cannot take a second chance" straddles the line between

recommending incarceration, as allowed by the Rule, and actively recommending a fixed life sentence, which is impermissible according to the Rule. I.C.R. 32(c) ("The presentence report may recommend incarceration but it should not contain specific recommendations concerning the length of incarceration . . . ."). Nevertheless, in light of the fact that the district judge recognized that the investigator (and, by implication, the PSI) was "not perfect," the fact that no specific sentence was, in fact, recommended, and the fact that there is no evidence that the district judge saw this as a recommendation of a fixed-life sentence, we cannot find that it was in violation of I.C.R. 32. We note, however, that this language was inappropriate and came close to crossing the line. In the future, presentence investigators would do well to avoid this kind of rhetoric.

3.      The Refusal to Allow Draper's Parents to Attend the Presentence Interview

Initially, the district court ruled that Draper could have his parents present during the presentence investigation interview process. However, the presentence investigator wrote a letter to the court stating:

> I question whether [Draper] can be totally honest regarding relationships (to include sexual relationships) or even substance abuse issues with a family member present. As the Court is aware, any areas of deception could reflect poorly on Mr. Draper if the truth should come out. I am also concerned the parents, in an effort to protect their son or themselves, will interfere with my interview if they do not like the direct questions regarding the crime or issues related to any abuse or neglect.

Based on this, the district court reversed its earlier decision, stating that "given the serious nature of the crime that was committed in this case, I'm going to defer to [the investigator's] request and it will be ordered that she can interview Draper without parents." This, perhaps more than the other issues regarding the PSI, is troubling. First, as noted above, I.C.R. 32 contemplates a neutral document for the use of the court in sentencing. It states that the trial judge is to order the PSI and, as such, it is the domain of the trial judge to determine the procedure for the interview. Second, as the investigator was not a party to the case, he or she has no standing to make a motion to the court. Simply put, it was not the investigator's role to request a different procedure for the PSI.

Draper argues that the refusal to allow his parents to attend the presentence interview violated his Fifth Amendment right against self-incrimination. This Court, in ruling that a psychosexual evaluation ordered by the trial court required access to counsel, stated:

> A psychosexual exam concerned with the future dangerousness of a defendant is distinguishable from a "routine" presentence investigation. Specifically, Idaho Rule of Criminal Procedure 32 does not require a defendant's participation in a presentence investigation report . . . . The presentence report relies greatly on information already available in public records, such as educational background, residence history and employment information. *See* I.C.R. 32(b).

*Estrada v. State*, 143 Idaho 558, 562, 149 P.3d 833, 837 (2006). More recently, the court of appeals, drawing on *Estrada* and the holdings of other state and federal courts, found that a routine presentence investigation did not constitute a critical stage of the proceedings and that counsel was not guaranteed. *Stuart v. State*, 145 Idaho 467, 470, 180 P.3d 506, 509 (Ct. App. 2007).

Against this, Draper argues that the general right against self-incrimination extends to sentencing proceedings. While Draper is correct in this regard, it does not assist him. He had the opportunity to refuse to participate in the presentence interview although he did not choose to. Notably, *Estrada* focuses on the fact that the defendant there only wished to have counsel advise him prior to the psychosexual evaluation.

> [T]he *Estelle* Court recognized that the defendant was not seeking a right to have counsel actually present during the exam. [*Estelle v. Smith*, 451 U.S. 454, 471, n.14 (1981)]. This clarification reflects a difference between the "limited right to the appointment and presence of counsel recognized as a Fifth Amendment safeguard in *Miranda*" and a defendant's Sixth Amendment right to assistance of counsel.

*Estrada*, 143 Idaho at 562, 149 P.3d at 837. Even without reaching the question of whether counsel is required for presentence interviews, *Estrada* limits its holding to the advice of counsel prior to participating in the investigation. Draper had access to that advice.

We find that the district judge did not commit reversible error by excluding Draper's parents from the PSI interview.

## E.  Draper's fixed life sentence for the murder of Stoddart does not constitute unconstitutional cruel and unusual punishment.

Draper argues that, because he was a juvenile at the time of the crime, his fixed life sentence constitutes cruel and unusual punishment under the U.S. and Idaho Constitutions. U.S. Const. amend. VIII; Idaho Const. art. I, § 6.

### 1.  Standard of Review

The requirements of the Idaho and U.S. Constitutions are questions of law, over which this Court has free review. *Stuart v. State*, 149 Idaho 35, 40, 232 P.3d 813, 818 (2010). In determining whether a punishment is categorically prohibited by the Eighth Amendment,

> [t]he Court first considers "objective indicia of society's standards, as expressed in legislative enactments and state practice" to determine whether there is a national consensus against the sentencing practice at issue. *Roper*[ *v. Simmons*, 543 U.S. 551], 572 [(2005)]. Next, guided by "the standards elaborated by controlling precedents and by the Court's own understanding and interpretation of the Eighth Amendment's text, history, meaning, and purpose," *Kennedy*[ *v. Louisiana]*, 554 U.S. 407, 421 [(2008)], the Court must determine in the exercise of its own independent judgment whether the punishment in question violates the Constitution. *Roper, supra,* at 572 . . . .

*Graham v. Florida*, 130 S. Ct. 2011, 2022 (2010).

> 2. The Eighth Amendment Prohibition of Cruel and Unusual Punishment

Draper argues that, by the same reasoning the U.S. Supreme Court applied in *Roper* to find that death sentences for juveniles constituted cruel and unusual punishment, fixed life sentences for juveniles are likewise cruel and unusual punishment. He notes that, in *Graham*, the Court applied a similar analysis to find all non-homicide fixed life sentences to constitute cruel and unusual punishment. These cases, he argues, compel a decision by this Court that fixed life sentences for juveniles convicted of homicide are likewise unconstitutional. Draper has not argued that his sentence is disproportionate to his crime under the analysis enunciated in *Graham*.

However, in *Graham* and *Roper*, the U.S. Supreme Court specifically distinguished homicide. In *Kennedy* the majority wrote:

> Consistent with evolving standards of decency and the teachings of our precedents we conclude that, in determining whether the death penalty is excessive, there is a distinction between intentional first-degree murder on the one hand and nonhomicide crimes against individual persons, even including child rape, on the other. The latter crimes may be devastating in their harm, as here, but "in terms of moral depravity and of the injury to the person and to the public," *Coker*[ *v. Georgia*, 433 U.S. 584], 598 [(1977)] (plurality opinion), they cannot be compared to murder in their "severity and irrevocability." *Ibid.*

554 U.S. at 438 (2008). In *Graham*, the Court cited *Kennedy* specifically to differentiate non-homicide crimes. *Graham*, 130 S.Ct. at 2027 ("The Court has recognized that defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers."). Likewise, in *Roper*, the Court

approvingly noted instances where the death penalty for juveniles was commuted to life without parole (including Roper's own sentence). 543 U.S. at 560, 564-65. Finally, in our recent decision in *State v. Windom*, this Court noted the "clear line of demarcation" in Eighth Amendment analysis between homicide and non-homicide offenses in *Graham* and *Kennedy*. *State v. Windom*, ___Idaho___, 253 P.3d 310, 317 n.2 (2011).

While it is possible that a national consensus against fixed life sentences for juveniles convicted of homicide crimes may develop at some point,[9] Draper has provided no evidence of such a consensus. Indeed, our holding today is in line with the unanimous opinion of those courts that have considered juvenile life without parole sentences for homicide offenses following *Graham*. *See, e.g., Commonwealth v. Ortiz*, 17 A.3d 417, 421-22 (Pa. Super. 2011); *Cox v. State*, 2011 Ark. 96, ___, 2011 WL 737307, at *2 (Mar. 3, 2011); *State v. Andrews*, 329 S.W.3d 369, 377-78 (Mo. 2010); *Meadoux v. State*, 325 S.W.3d 189, 195 (Tex. Crim. App. 2010); *Gonzalez v. State*, 50 So.3d 633, 634-35 (Fla. Dist. Ct. App. 2010); *State v. Twyman*, No. 9707012195, 2010 WL 4261921, at *2 (Del. Super. Ct. Oct. 19, 2010); *Lotts v. Purkett*, No. 4:07CV610 RWS, 2010 WL 2653636, at *1 (E.D. Mo. June 29, 2010); *Miller v. Alabama*, 63 So. 3d 676, 691 (Ala. Crim. App. 2010). We hold that Draper's fixed life sentence does not constitute cruel and unusual punishment under the United States Constitution.

3.      The Idaho Constitution's Prohibition on Cruel and Unusual Punishment

Draper further argues that, even if the Eighth Amendment to the U.S. Constitution would permit a fixed life sentence, the Idaho Constitution would forbid it under Article I, Section 6. This Court's analysis of whether a sentence violates Article I, Section 6, has traditionally tracked the U.S. Supreme Court's Eighth Amendment jurisprudence. *See, e.g., State v. Brown*, 121 Idaho 385, 393-94, 825 P.2d 482, 490-91 (1992) (modifying the Court's Article I, Section 6 proportionality analysis based on the U.S. Supreme Court's decision in *Harmelin v. Michigan*, 501 U.S. 957 (1991)). Draper has not pointed to any Article I, Section 6 analysis that would implicate "the concerns of this Court and the 'uniqueness of our state, our Constitution, and our long-standing jurisprudence.'" *Rhoades v. State*, 149 Idaho 130, 139, 233 P.3d 61, 70 (2010) (quoting *State v. Donato*, 135 Idaho 469, 472, 20 P.3d 5, 8 (2001)). Rather, Draper points to the statement in *State v. Broadhead*, 120 Idaho 141, 146, 814 P.2d 401, 406 (1991), *overruled on*

---

[9] "[T]he standard of extreme cruelty is not merely descriptive, but necessarily embodies a moral judgment. The standard itself remains the same, but its applicability must change as the basic mores of society change." *Kennedy*, 554 U.S. at 419 (quoting *Furman v. Georgia*, 408 U.S. 238, 382 (1972) (Burger, C.J., dissenting)).

- 28 -

*other grounds by State v. Brown*, 121 Idaho 385, 825 P.2d 482 (1992), that "[i]n modifying sentences, the Court has given great weight to the age of a defendant . . . ." (Quoting *State v. Adams*, 99 Idaho 75, 79, 577 P.2d 1123, 1127 (1978) (Bistline, J. dissenting)). Notably, this statement came in the context of an analysis of the reasonableness of the sentence rather than the constitutionality of that sentence. As the Court noted in *Broadhead*, "[i]n reviewing the reasonableness of a sentence, we are exercising our authority as an appellate court to determine whether the trial court abused its discretion. In deciding whether a sentence is cruel and unusual, we must decide whether it is proportional." 120 Idaho at 146, 814 P.2d at 406 (internal citation omitted). Likewise, in *Windom*, we refused to conflate the analysis of whether a sentence constitutes cruel and unusual punishment with the issue of whether a court abused its discretion in imposing a sentence. ___ Idaho at ___, 253 P.3d at 317 n.2 ("[I]t is neither necessary nor appropriate to confuse our well-established standard of review of a trial court's sentencing decision by selective application of statements found in decisions defining the scope of Eighth Amendment protections."). Thus, whether the district court considered Draper's age in applying his sentence is a question of the district court's discretion, rather than a categorical determination of whether the sentence was unconstitutional and is treated below.

Draper's fixed life sentence for murder does not constitute cruel and unusual punishment in violation of the U.S. or Idaho Constitutions.

**F.** **The district court did not abuse its discretion by imposing a fixed life sentence for Draper's conviction of first degree murder.**

1.      Standard of Review

"When a sentence is within the statutory limits, we will review the sentence for an abuse of discretion." *State v. Farwell*, 144 Idaho 732, 734-35, 170 P.3d 397, 399-400 (2007) (citing *State v. Knighton*, 143 Idaho 318, 319, 144 P.3d 23, 24 (2006)). "A sentence is reasonable if at the time of imposition it appears necessary to achieve 'the primary objective of protecting society and to achieve any or all of the related goals of deterrence, rehabilitation or retribution applicable to the given case.'" *State v. Lundquist*, 134 Idaho 831, 836, 11 P.3d 27, 32 (2000) (quoting from *State v. Toohill*, 103 Idaho 565, 568, 650 P.2d 707, 710 (Ct. App. 1982)).

Imposing a fixed life sentence "requires a high degree of certainty that the perpetrator could never be safely released back into society or that the nature of the offense requires that the individual spend the rest of his life behind bars." *State v. Stevens*, 146 Idaho 139, 149, 191 P.3d 217, 227 (2008) (quoting *State v. Cross*, 132 Idaho 667, 672, 978 P.2d 227, 232 (1999)). "When

reviewing a fixed life sentence, the primary factors considered are the gravity of the offense and/or the need to protect society from the defendant." *Windom*, ___Idaho at ___, 253 P.3d at 313 (quoting *State v. Cannady*, 137 Idaho 67, 73, 44 P.3d 1122, 1128 (2002)).

2.      The District Court's Consideration of the Severity of Draper's Crime and the Goals of Protecting Society, Deterrence, Rehabilitation, and Retribution

At the sentencing hearing, the district judge highlighted findings of Alan Brantley, an FBI profiler, and Dr. Hazenbuehler, the psychologist appointed to evaluate Draper. He noted their findings that Draper was "a severely disturbed individual" and that Draper was "an entirely different individual than portrayed by [his] family members and friends, and also that [he] should not be released into society." He concluded that "based on all the evidence and all that I've read, I'm convinced that if you two [referring to Draper and Adamcik], or either one of you, were released, that you would kill again. I'm convinced of that beyond a reasonable doubt."

Draper further highlights two particular statements by the district court, including that "[t]eenage killers perhaps should receive no mercy. I don't know." He also notes that the district court stated that "I'm not unmindful of how young you fellows are, but you commit a crime of this nature and it's got to be – it's got to be known, not only by those who commit it, but to others in the community that punishment would not – will not be so merciful. There's no mercy." These statements, Draper argues, indicate that the district court viewed his age as a solely aggravating factor in determining the sentence. This is incorrect. The statement "I'm not unmindful of how young you fellows are," and the earlier statement that "you are so young" directly address Draper's age as a potentially mitigating circumstance. In addition, the entire sentencing hearing was focused on the planning and execution of Stoddart's murder and the importance of protecting society. This Court looks to the entire record on appeal in light of the objectives of sentencing to determine whether a sentence was an abuse of discretion. *Stevens*, 146 Idaho at 148, 191 P.3d at 226. In this context, it is not that the district court disregarded Draper's age but that the indications that Draper remained a danger to society outweighed that potentially mitigating circumstance.

We note that, as the district court stated, Stoddart's murder was "a barbarous and cold-blooded horrific act." She was stabbed numerous times with multiple potentially fatal wounds. There was substantial evidence that this murder was part of a long-term plan by Draper and Adamcik and that it was the first in a planned spree of killings. We further note that the videotape includes Draper's statement that "I just killed Cassie." These facts, combined with the

- 30 -

constantly shifting nature of Draper's story to police and before the court and the evidence that he wielded the serrated knife that inflicted the majority of the wounds, suggests that he does pose a continuing danger to society and will for the remainder of his life. These facts lead us to reject Draper's argument that the district court's decision could not have been based on substantial and competent evidence because the reports of Mr. Brantley and Dr. Hazenbuehler assessed Draper as a "medium" risk to reoffend in a similar fashion. In light of the assessment of even a medium risk of reoffending and the brutal and premeditated nature of this particular offense, there was substantial and competent evidence to support the district court's finding.

Viewed in light of the gravity of the offense and the need to protect society from the defendant, we find that the district court's imposition of a fixed life sentence was not an abuse of discretion.

## G. The district court did not abuse its discretion in denying Draper's motion for a reduction of his sentence under Idaho Criminal Rule 35.

### 1. Standard of Review

Rule 35 is a narrow rule which allows a trial court to correct an illegal sentence or to correct a sentence imposed in an illegal manner. Generally, whether a sentence is illegal or whether it was imposed in an illegal manner is a question of law, over which we exercise free review. However, if the basis for the illegality of the sentence is that the sentence is excessive, and the sentence is within the statutory limits, a motion for reduction of sentence under Rule 35 is a plea for leniency, and this Court will then review a denial or grant of the motion for an abuse of discretion. When presenting a Rule 35 motion, the defendant must show that the sentence is excessive in light of new or additional information subsequently provided to the district court in support of the Rule 35 motion. An appeal from the denial of a Rule 35 motion cannot be used as a vehicle to review the underlying sentence absent the presentation of new information.

*Farwell*, 144 Idaho at 735, 170 P.3d at 400 (internal citations and quotations omitted). "If the sentence was not excessive when pronounced, the defendant must later show that it is excessive in view of new or additional information presented with the motion for reduction." *State v. Knighton*, 143 Idaho 318, 320, 144 P.3d 23, 25 (2006).

### 2. The district court did not abuse its discretion in denying Draper's Rule 35 motion.

Draper contends that the district court abused its discretion in denying his motion for a correction of sentence under I.C.R. 35. He points to statements provided by Draper and his parents as well as a progress report from the Department of Correction and additional documents that he provided with his Rule 35 motion. These, he argues, "demonstrate that Brian has

rehabilitative potential and still continues to strive to make [sic] for his actions and [Stoddart's] death." It is unclear whether Draper is arguing that the district court did not consider that additional evidence and thus abused its discretion, or whether he is arguing that, based on the additional information, the district court acted outside the bounds of its discretion. In either case, Draper's argument fails.

The district court did consider the additional information. The court properly concluded that the motion was effectively a request for leniency. Similar testimony as to Draper's character and his characterization of the events surrounding Stoddart's murder were presented at sentencing. Nevertheless, the court "reviewed everything again --- including the new documents . . . filed." In light of its review, the district court stated that "[t]he killing of Cassie Stoddart was not done on a whim. It was carefully planned – and intentional, senseless, brutal, barbaric conduct." The district court did not ignore the Rule 35 motion but declined to alter the sentence in light of Draper's additional submissions. In short, the additional evidence was considered but did not change the trial court's original views.[10]

We therefore find that the district court did not abuse its discretion in denying Draper's I.C.R. 35 motion.

### III. CONCLUSION

We find that there was no error in the murder instruction. The jury instruction regarding the elements of conspiracy to commit first degree murder was erroneous and the error was not harmless. The district court did not err in admitting Draper's fourth confession and there was no cumulative error. Although the PSI was problematic, we cannot find that it resulted in prejudice to Draper. Draper's fixed life sentence for first degree murder does not constitute unconstitutional cruel and unusual punishment and the district court did not abuse its discretion in sentencing Draper to a fixed life sentence. The district court did not abuse its discretion in refusing to reduce Draper's sentence. For these reasons, we affirm the judgment and sentence entered upon the jury's verdict that Draper committed first degree murder. We vacate the conviction for conspiracy to commit first degree murder and remand for a new trial on that charge.

---

[10] The district court did state that it was "somewhat reluctant to say much because I fear that an appellate court judge will grab onto a word or two that I might say and take it in the wrong way . . . ." This refusal to say much makes it difficult for this Court or any appellate court to ascertain whether the lower court was, in fact, exercising reason in reaching its conclusions. In the present case, however, what the court did say is sufficient to determine that it exercised reason in denying the motion.

Chief Justice BURDICK and Justice EISMANN **CONCUR**.

J. JONES, J., concurring in part and dissenting in part.

I concur with the Court's opinion except for (1) Part II.A.4, regarding the conspiracy jury instruction, (2) the reference in Part II.C. to the instruction as constituting reversible error, and (3) the conclusion in Part III that the conspiracy conviction must be vacated. I do not believe that the misnumbering on the instruction was such as to cause jury confusion and, in any event, it did not constitute fundamental error. I would uphold the conspiracy conviction.

Instruction No. 17 was not fatally defective. Although the seventh element of the conspiracy charge was misnumbered by the addition of a handwritten "5" over the typed "7," the renumbering did not change the meaning or context of the instruction. The sixth element of the conspiracy charge called for proof that "one of the parties to the agreement performed at least one of the following acts," then listed four factual situations, each stating dates, Draper's name, and a description of events that were directed toward commission of the murder of Cassie Stoddart. The misnumbered element, "such act was done for the purpose of carrying out the agreement," contained none of these factual situations. The misnumbered item had the same margin as the other six elements of the conspiracy charge, rather than the indented margin of the four factual situations listed in the sixth element. The first word in the misnumbered element began with a lower case letter, indicating its connection to the other six elements, rather than to the four factual situations listed under the sixth element, in all of which the first word began with a capital letter. The word "act" in the misnumbered element could only refer back to the "following acts" referenced in the introduction of the sixth element, since that word appears nowhere else in the instruction. It is unlikely that a rational jury's attention would be focused on the numeral five that had been renumbered, rather than on the substance of the text, which was the critical part necessary for the jury to carry out its responsibility.

Turning to the substance of Instruction No. 17, any infirmity in the misnumbered seventh element was cured by the substance of the four factual situations listed under element six. The jury was instructed to find that Draper had performed at least one of those factual situations and it must be assumed that the jury complied with the instruction. Pursuant to the first five elements of the instruction, the jury found that Draper had agreed with Adamcik to commit the crime of murder in the first degree. Each of the factual situations in the sixth element described certain

facts and then ended with the conclusion that the actions were performed to commit, or for the commission of, the murder of Cassie Stoddart, which was the subject of the agreement. Had this concluding phrase been left off of any of the four factual situations, Draper may have a better argument. However, the concluding phrase on each of the four factual situations essentially furnished the seventh element of the conspiracy, making the misnumbered seventh element largely superfluous. Rational jurors could not have concluded that any of the four factual situations was performed for any purpose other than to carry out the subject matter of the agreement—commission of the murder of Cassie Stoddart.

Furthermore, jury instructions are to be viewed as a whole because "[i]t is well established that [an] instruction 'may not be judged in artificial isolation' but must be considered in the context of the instructions as a whole and the trial record." *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). Instruction No. 17-A instructed, "The defendant is not guilty of Conspiracy if the defendant in good faith withdrew by informing another party to the conspiracy of the defendant's withdrawal before any party performed *an act for the purpose of carrying out the agreement*." (emphasis added) Reading Instruction Nos. 17 and 17-A together, it is clear that the State was required to prove Draper had performed one of the four described factual situations for the purpose of carrying out the agreement in order to be convicted of conspiracy.

This is not a case where an element of the offense was omitted. Rather, the instruction was complete, but one element was merely mislabeled. However, even if one were to consider this as an omitted element instruction, it would pass the harmless error test. In *State v. Perry*, we stated:

> [W]here the jury instructions were only partially erroneous, such as where the jury instructions improperly omitted one element of a charged offense, the appellate court may apply the harmless error test, and where the evidence supporting a finding on the omitted element is overwhelming and uncontroverted, so that no rationale jury could have found that the State failed to prove that element, the constitutional violation may be deemed harmless.

150 Idaho 209, 224, 245 P.3d 961, 976 (2010). The evidence in this case overwhelmingly supports Draper's conviction for conspiracy to commit first degree murder. No rational jury could have found that the State failed to prove the seventh element of the charged offense. Although Draper does contest that element, such contest must be viewed in context of the six

elements of the charged offense which the jury found to have been proven beyond a reasonable doubt. The jury found that, "On or between the 22nd and 23rd days of September, 2006, in the State of Idaho, the defendant Brian Lee Draper and Torrey Michael Adamcik agreed to commit the crime of murder in the first degree, [Draper] intended that the crime would be committed, [and that] one of the parties to the agreement performed at least one of the following acts." The instruction then lists the four previously discussed factual situations, all of which directly involved Draper and all of which were specifically directed toward commission of the murder of Cassie Stoddart—purchasing the knives to use in the commission of the murder, driving to the residence where she was located that night to commit the murder, retrieving the clothing and murder weapons for use in the commission of the murder, and lying in wait in the residence in preparation for the commission of the murder. In light of the jury's undisputed finding of agreement and intent to kill Cassie Stoddart, these acts are logically inseparable from a finding that they were committed in furtherance of the murder agreement. Despite Draper's feeble protestations, no rational jury could have found that any one of the four factual situations was performed for any other purpose than to commit the parties' agreed and intended crime—the first degree murder of Cassie Stoddart. This is particularly true with respect to the second factual situation—that Draper traveled to the Whispering Cliff's residence with Adamcik "to commit the murder of Cassie Stoddart"—because Draper proclaimed that to be the case in the video recording. There is no possibility a rational jury could have found otherwise. Thus, even if there were an error, it was harmless.

There is overwhelming evidence in the record to support Draper's conviction for first degree murder and to support his conviction for conspiring to commit that murder. Any contention that Draper only intended to scare Stoddart as a joke, and not to murder her, rings hollow in light of his first degree murder conviction. I would uphold both convictions. They are inseparable.

W. Jones, Justice, concurring in part and dissenting in part:

I concur in the majority Opinion in all respects but for Section II A(4) in which the majority vacates Draper's conviction for conspiracy to commit first degree murder.

First, with respect to the remainder of the majority Opinion, I write separately only for the purpose of reconciling my dissent in *State v. Windom,* Docket No. 36656, 2011 WL 891318 (Idaho Mar. 16, 2011), with the Court's holding in Section II F(2) affirming Draper's fixed life

sentence for first degree murder. In *Windom*, I stated that the district court abused its discretion when it imposed a fixed-life sentence on a sixteen-year-old boy with a severe mental illness because an offender's individual characteristics are, in my opinion, relevant to the reprehensibility of a crime, contrary to the majority's holding in *Windom* that these individual characteristics need not be taken into consideration in determining reprehensibility. 2011 WL 891318 at *12-13. As I explained there, "[a] crime is less reprehensible—and therefore potentially less deserving of severe retribution—if the criminal has personally mitigating circumstances." *Id.* at *13. The Majority here analogizes this case to *Windom* and holds, consistent with the majority in *Windom,* that the nature of the crime alone is sufficient to support the fixed-life sentence. Under the facts of this particular case, I agree with the Court's conclusion affirming the fixed-life sentence, but not its rationale.

The district court's imposition of a fixed-life sentence here is consistent with my dissent in *Windom* because, given Draper's individual characteristics, the reprehensibility of this crime fully supports the fixed-life sentence. There are substantial and important differences between the facts of *Windom* and this case. The main similarity between the two cases is that both Draper and Windom were sixteen years of age and committed murder in a particularly heinous way: Draper by stabbing a friend to death with 37 stab wounds and Windom by beating his mother to death with a dumbbell. However, other than their respective ages at the time the crimes were committed, I do not find parallels in their individual characteristics such that I believe the district court abused its discretion in imposing a fixed-life sentence on Draper. Windom, on the other hand, had a psychotic disorder, paranoid schizophrenia, which *caused* him to kill his mother. *Id.* at *14. Draper had no such psychotic disorder. The only evidence here relates to personality disorders, not psychosis.

In the present case, there is no evidence that Draper suffered from any pathological drive or desire that *caused* him to commit this crime. Rather, as shown in the video tape of Draper and his co-conspirator, Adamcik, the evidence shows that Draper murdered Stoddart in an attempt to achieve fame in the same manner as the Columbine killers. The facts here simply do not indicate that Draper, unlike Windom, killed as a result of a serious mental illness which can be properly treated. Indeed, the facts show that Draper killed to achieve fame by not only killing Stoddart, but also intending to kill individuals to exceed the number of deaths in the Columbine killings.

Also, in contrast to Draper, Windom reported his homicidal thoughts to authority figures and continually sought help for his mental illness weeks before the murder but was never taken seriously. Draper, on the other hand, secretly plotted and planned the murder of Cassie Stoddart days before the killing, which was to be a "tune up" or practice before other intended killings.

Because I believe that under these circumstances the reprehensibility of the crime fully supports the fixed life sentence imposed here, I agree with the Majority that there is no need to consider rehabilitation in this case and that Draper's sentence was not an abuse of discretion and should be affirmed.

With respect to my dissent from the Majority's vacation of the conspiracy conviction in Section IIA(4), I agree that there was error in the court's instruction regarding the elements required to prove conspiracy but, unlike the Majority, I believe the error was harmless beyond a reasonable doubt and the verdict would have been the same regardless of the error. I fully understand the reasoning of the Majority on this issue, but I am unable to understand how a reasonable jury could possibly, under the facts of this case, come to the conclusion that Cassie Stoddart's murder was not the result of a conspiracy between Adamcik and Draper to commit it. In my opinion, no reasonable person could possibly watch the video tapes in evidence showing Draper and Adamcik discussing and planning the murder and not find a conspiracy. There was also substantial evidence proving the joint actions of both Adamcik and Draper in burying the evidence and preparing an alibi to cover up their involvement in the crime. I would, therefore, affirm the conviction and sentence on the charge of conspiracy to commit first degree murder.